KANSAS CITIES, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Kansas Gas and Electric Company, Intervenor.

No. 81–2248.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 25, 1983.

Decided Dec. 13, 1983.

Petition for Review of an Order of the Federal Energy Regulatory Commission.

Charles F. Wheatley, Jr., Washington, D.C., with whom Don Charles Uthus, Washington, D.C., was on brief, for petitioners. William Steven Paleos, Washington, D.C., also entered an appearance for petitioners.

Norma J. Rosner, Atty., F.E.R.C., Washington, D.C., with whom Jerome M. Feit, Sol., and Charles A. Moore, Gen. Counsel, F.E.R.C., Washington, D.C., was on brief, for respondent.

Barbara J. Weller, Deputy Sol., and George H. Williams, Jr., Atty., F.E.R.C., Washington, D.C., also entered appearances for respondent.

J. Michael Peters and Ralph Foster, Wichita, Kan., were on brief, for intervenor.

Before EDWARDS and SCALIA, Circuit Judges, and VAN DUSEN,* Senior Circuit Judge of the United States Court of Appeals for the Third Circuit.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

Cities from the state of Kansas petition under 16 U.S.C. § 825*l*(b) (1982) for review of a Commission order approving increased electricity rates to be charged by their supplier, Kansas Gas and Electric Company ("KG & E"). The principal issues are what standard the various supply contracts established for Commission-prescribed rate changes, and whether the Commission could fix rates before determining that the new rates did not create a so-called price squeeze.

The basic facts are as follows: On September 6, 1977, KG & E filed proposed new electric rate schedules under § 205 of the Federal Power Act ("FPA"), 16 U.S.C. § 824d (1982), for services rendered to 24 municipal systems. A number of cities moved to reject the increased rates on various grounds, two of which bear on this appeal. First, they argued that they had bargained for "fixed rate" contracts not subject to producer-initiated increases in § 205 proceedings under *FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). Second, relying on *FPC v. Conway Corp.,* 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), they claimed that the new schedules would cause a price squeeze, *i.e.,* that the difference between KG & E's wholesale rates to them and its retail rates to customers for whose business they and KG & E are in competition does not adequately reflect differing costs and thereby places them at a competitive disadvantage. On December 8, 1977, the Commission accepted the filing subject to determination of the *Sierra* issue, and directed the administrative law judge to convene a hearing on the lawfulness of the proposed rates and in particular on the alleged price squeeze. *Kansas Gas and Electric Co., Order Conditionally Accepting for Filing and Suspending Proposed Increased Rates,* 1 FERC (CCH) ¶ 61,225, at 61,573.

On February 1, 1978, the Commission issued *Kansas Gas and Electric Co., Order Granting in Part and Denying in Part Motion to Reject,* 2 FERC (CCH) ¶ 61,095 ("1978 Order"), in which it held that contracts of the type held by the cities Bronson, Neodesha, and Iola ("Bronson con-

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

tracts," "Neodesha contracts" and "Iola contracts," respectively) had eliminated § 205 changes, and instituted its own rate determination under § 206 of the FPA. It found that the Bronson and Neodesha contracts would require application of a just-and-reasonable standard for rate changes, and the Iola contracts a public-interest standard.

The administrative law judge applied the standards established by the Commission in his *Kansas Gas and Electric Co., Initial Decision,* 7 FERC ¶ 63,051 (May 29, 1979) ("ALJ Decision"). He approved changes for the Bronson and Neodesha contracts and apparently denied them for the Iola contracts. He also found that the price squeeze allegation failed because no credible evidence existed to sustain a price discrimination finding.

In Opinion No. 80, *Kansas Gas and Electric Co., Opinion and Order on Application for Rate Increase,* 10 FERC (CCH) ¶ 61,243 (Mar. 19, 1980), the Commission reviewed the ALJ's findings. It modified slightly the approved changes for the Bronson and Neodesha contracts and rejected changes for the Iola contracts. The Commission did not affirm the ALJ's disposition of the price squeeze issue but deferred remand until KG & E filed its cost of service under the approved rate, its current retail rate and other information, and until the cities determined whether, in light of that data, they still wished to assert a price squeeze.

On January 2, 1981, the Commission accepted KG & E's revised rate filing, finding it in compliance with Opinion No. 80. *Kansas Gas and Electric Co., Order Accepting Compliance Filing,* 14 FERC (CCH) ¶ 61,-006. On February 2, certain cities filed a *Request for Rehearing and Clarification,* which complained that the approved rate changes for certain interchange services (namely, emergency and economy services) and for transmission services under the Iola contracts were not authorized by the Commission's prior opinion and were barred by the contracts, and that changes under the Bronson and Neodesha contracts should have been limited to those in the public

interest. That same day, they filed a *Request for Expedited Price Squeeze Determination,* in which they realleged a price squeeze and requested that the Commission remand for hearing before the due date of the January bills.

In a May 1, 1981 order, the Commission held that the cities would have to make a prima facie showing of a price squeeze to obtain remand of that issue. *Kansas Gas and Electric Co., Order on Request for Remand of Price Squeeze Issue,* 15 FERC (CCH) ¶ 61,114A. On June 1, 1981, the cities sought reconsideration of this determination, requesting remand and immediate refund and rate reduction pending final resolution of the price squeeze issue. *Petition for Rehearing of May 1, 1981 Order.*

In Opinion No. 80–B, *Kansas Gas and Electric Co., Order on Petitions for Rehearing,* 17 FERC (CCH) ¶ 61,180 (Nov. 24, 1981), the Commission held that the Iola contracts established a just-and-reasonable standard for rate changes in interchange and transmission services. The Commission also held that the cities had not yet made a prima facie showing of a price squeeze and that it would not remand on the issue absent such showing. However, it reserved final judgment on whether to remand until KG & E filed a consistent cost of service analysis. Finally, it held that the rates approved on January 2 had been authorized to be implemented immediately, but required KG & E to stipulate that it would make refund should a price squeeze be found to exist. The cities filed a petition for review in this court on November 30, 1981. On September 20, 1982, the Commission finally found the price squeeze issue not worthy of remand and on November 18 reaffirmed this determination. Opinion No. 80–D, *Kansas Gas and Electric Co., Opinion and Order on Request for Rehearing,* 21 FERC ¶ 61,086.

On appeal, the cities make three arguments: first, that the Commission erred in applying a just-and-reasonable standard to rate changes in the Bronson and Neodesha contracts; second, that application of that standard to rate changes for interchange

and transmission services in the Iola contracts is both procedurally precluded and substantively wrong; and third, that the Commission cannot prescribe rates without first resolving the price squeeze issue.

### JURISDICTION

■ Before entertaining the merits, we must determine whether we have jurisdiction to consider the issues raised by petitioners. Section 313(a) of the Federal Power Act provides

> Any person ... aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person ... is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based.... No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon.

16 U.S.C. § 825*l*(a) (1982). Section 313(b) of the same Act says:

> No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do.

16 U.S.C. § 825*l*(b) (1982). Compliance with these provisions is a prerequisite to judicial review. *See FPC v. Colorado Interstate Gas Co.*, 348 U.S. 492, 498 & n. 4, 75 S.Ct. 467, 471 & n. 4, 99 L.Ed. 583 (1955) (identical section of Natural Gas Act read

to preclude judicial review when objection not preserved before agency).

Despite its obvious interest in protecting the integrity of its processes by assuring that rehearings are sought, the Commission neither raised the jurisdictional issue here nor suggested in its own opinions any failure by petitioners to comply with rehearing requirements.[1] KG & E, intervenor on appeal, asserts that because of the cities' failure to seek timely rehearing, the issues of whether the Bronson and Neodesha contracts permit just-and-reasonable changes and of whether the Commission may establish an interim rate change pending resolution of the price squeeze issue are not properly before this court. It is clear that these issues were timely raised in the cities' *Request for Rehearing and Clarification* (Feb. 2, 1981) and their *Petition for Rehearing of May 1, 1981 Order* (June 1, 1981), respectively.[2] The crux of KG & E's complaint is that these petitions did not address the proper order.

■ KG & E contends that we cannot consider the *Sierra* issue for the Bronson and Neodesha contracts because the cities did not request rehearing of the 1978 Order which first specified the standard of proof. The statute, however, attaches the 30-day application-for-rehearing requirement not to the issue involved, but to the *order* that comes before us for review. "While *a petition from an agency order* cannot be filed after the statutory period for filing has run, it may be that *some of the issues* that might have been raised in that appeal are so inextricably linked to a subsequent agency opinion on another aspect of the same

1. The Commission's brief does not mention the issue. The Commission did not dismiss the Bronson and Neodesha rate-change standard claims in the February 2, 1981 *Request for Rehearing and Clarification* as "untimely," and its casual references in Opinion No. 80–B to the *Petition for Rehearing of May 1, 1981 Order* as a "motion" or "request" were not holdings that the petition was not properly one for rehearing—as the very title of the Opinion (*Order on Petitions for Rehearing*) suggests, 17 FERC (CCH) ¶ 61,180, at 61,347–48.

2. Although filed thirty-one days after the Orders questioned, the February 2 and June 1,

1981 rehearing petitions were filed within the statutory time period as interpreted by the Commission's regulations. They were filed on a Monday and the regulations added an extra day to the time period when the thirtieth day fell on a weekend or holiday. 18 C.F.R. § 1.13(a) (1980). We have previously approved this elaboration of the statute. *See Corning Glass Works v. FERC*, 675 F.2d 392, 396 n. 12 (D.C.Cir.1982); *Cities of Batavia v. FERC*, 672 F.2d 64, 72–73 (D.C.Cir.1982). *Cf.* Fed.R.Civ.P. 6(a).

case, that those issues may be raised in a timely appeal from the second opinion." *Cities of Batavia v. FERC,* 672 F.2d 64, 72 n. 15 (D.C.Cir.1982) (emphasis in original). That situation obtains here, since the *Order Accepting Compliance Filing* was based upon the standard specified in the earlier order. There is, moreover, good reason to permit the deferred challenge—namely, considerable doubt whether the cities were persons "aggrieved" by the earlier order[3] and were therefore entitled to seek rehearing and review at that time. *See* 16 U.S.C. § 825*l*(a), (b); *Sam Rayburn Dam Electric Coop. v. FPC,* 515 F.2d 998, 1007 (D.C.Cir. 1975), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976).

KG & E also argues that the cities forfeited the opportunity to litigate the legality of the interim rates. First, it contends that the cities should have objected to the *Order Accepting Compliance Filing* on that ground. With regard to assessment of interim rates, however, the effect of that order upon the cities was unclear. Although it made new rates effective from January 2, 1981, it did not modify the previous orders later described by the Commission itself as ambiguous. Opinion No. 80–B, 17 FERC (CCH) ¶ 61,180, at 61,347 ("Opinion[s] Nos. 80 and 80–A are unclear about which rates should be charged from the time KG & E's compliance filing is accepted"). Given this lack of clarity, we think the cities justifiably understood the *Order Accepting Compliance Filing* to mean that the new rates, though effective as of January 2, 1981, would not be assessable until the price squeeze issue was resolved. Only the May 1, 1981 order made it apparent that the Commission meant otherwise. Under the circumstances, we retain jurisdiction.

The policy requiring timely filing of motions for reconsideration is one of fairness to the FPC and to parties affected by its order; only a perversion of that policy could be used to cut off the rights of a party that filed its application in good faith, as soon as it could reasonably have become aware of the import of an FPC order. [The other position] would permit an administrative agency to enter an ambiguous or obscure order, wilfully or otherwise, wait out the required time, then enter an "explanatory" order that would extinguish the review rights of parties prejudicially affected.

*Sam Rayburn Dam Electric Coop., supra,* 515 F.2d at 1007.

Alternatively, KG & E argues that Opinion No. 80–B was an original order demanding a petition for rehearing. We think not. All of its dispositions challenged here dealt with objections raised in prior rehearing petitions; when those objections were rejected they did not have to be asserted before the Commission yet again.

### THE NEODESHA AND BRONSON CONTRACTS

The Bronson contract reads:

Company's Rate Schedule PWM–268, as well as its Service Regulations, is expressly subject to change pursuant to orders of the State Corporation Commission or any other governmental body having jurisdiction. Any such change so ordered or approved shall affect this agreement only with respect to the portion or subject matter so changed, all other portions or provisions remaining in full force and effect, both parties reserving the right to contest the validity of any such orders or approvals in the courts.

---

**3.** Preliminary orders deciding the burden of proof applicable to a forthcoming § 206 hearing have been held not to aggrieve the parties and thus not to be immediately appealable. *Public Service Co. of New Mexico v. FPC,* 557 F.2d 227, 232–33 (10th Cir.1977). We have acknowledged the possible validity of that holding. *City of Oglesby v. FERC,* 610 F.2d 897, 901 n. 20 (D.C.Cir.1979) (dictum). Preliminary orders determining the availability of a § 205 proceeding are different, in that they result in immediate financial injury to the purchasers—immediate application of the newly filed rates—whereas § 206 changes are not effective until the Commission determines the proper rates. *See Papago Tribal Utility Authority v. FERC,* 628 F.2d 235, 244–45 (D.C.Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980).

1978 Order, 2 FERC (CCH) ¶ 61,095, at 61,-228. The Neodesha contract provides:

> This Agreement and all obligations hereunder are subordinate to, subject to and conditioned upon the valid orders (including but not necessarily limited to orders fixing or approving rates and/or standards and conditions of service) of, and the granting of approval and authorization by any Commission or other regulatory body having rate making and/or other jurisdiction or whose approval or authorization may be required by law including any judicial review thereof.

*Id.* at 61,229. As described more fully in *Papago Tribal Utility Authority v. FERC,* 723 F.2d 950 (D.C.Cir.1983), decided today, the FPA permits three contractual regimes for electricity rate changes: first (most favorable to the utility), unilaterally proposed changes under § 205, 16 U.S.C. § 824d (1982), which must be approved if "just and reasonable"; second (most favorable to the customer in times of increasing costs), Commission-initiated changes in proceedings commenced under § 206, 16 U.S.C. § 824e (1982), applying a standard that permits only those changes required by the "public interest"; and third (in-between the two in times of increasing costs), Commission-initiated changes in proceedings commenced under § 206 applying a standard that permits those changes that are "just and reasonable." The Commission here held that the Bronson and Neodesha contracts fell into the third category; the cities argue that they fall into the second.

Preliminarily, we must note our recognition that seeking to ascertain the parties' true contractual intent regarding whether their agreements belong in the second or third category is a search for a needle in a haystack in which there is good reason to believe no needle exists. For at the time all of the contracts involved in this petition for review were concluded, it was not clearly understood that the third category existed. The Supreme Court's opinion in *FPC v. Sierra Pacific Power Co., supra,* was thought by many, including the Commission itself, to permit only the public-interest standard in § 206 proceedings, *see Carolina Power & Light Co.,* 47 F.P.C. 1, 4 (1972). It is quite probable, therefore, that the parties to the present contracts not only had in mind no specific answer to the question here at issue, but did not even understand that the question could be asked. Deciding whether to place their contracts in category two or category three may be more in the nature of a policy determination regarding application of new law to existing contractual arrangements than of a factual or legal conclusion regarding the meaning of contracts. Our ensuing discussion, however, follows the convention in this field—that the parties' specific intent is dispositive of a contractual issue, rather than that the parties' general expectations are relevant to a policy determination.

Even assuming that the exercise we are here reviewing involves not policy-making but a search for the parties' contractual intent, that search nonetheless profits from familiarity with the field of enterprise to which the contract pertains. Whether interpretation of the present agreements raises an issue of law, *see Pennsylvania Avenue Development Corp. v. One Parcel of Land,* 670 F.2d 289, 292 (D.C.Cir.1981), or an issue of fact, *see Davis v. Chevy Chase Financial Ltd.,* 667 F.2d 160, 169 (D.C.Cir.1981), we would be foolish not to accord great weight to the judgment of the expert agency that deals with agreements of this sort on a daily basis. *See Papago Tribal Utility Authority v. FERC,* 610 F.2d 914, 930 n. 126 (D.C.Cir.1979). Particularly with regard to issues of contractual interpretation pertaining to application of the *Sierra* doctrine, we have found it "proper to defer to the Commission's expertise if its decision is 'amply supported both factually and legally.'" *Gulf States Utilities Co. v. FPC,* 518 F.2d 450, 457 (D.C.Cir.1975), *quoting from United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div.,* 358 U.S. 103, 114, 79 S.Ct. 194, 200, 3 L.Ed.2d 153 (1958). We find the Commission's interpretation amply supported here.

The obstacle that the public-interest standard presents to a rate change is almost

insurmountable, *see Papago Tribal Utility Authority v. FERC, supra,* at 954 (decided today). To assume that a contractual provision pertaining to rate adjustment refers to that standard is to assume that it was intended to be virtually inoperative; whereas to interpret it as referring to just-and-reasonable changes is to give it a content that is both substantial and fair to both sides. Thus, courts and the Commission have almost universally construed contractual references to future rate changes to authorize § 206 proceedings with a just-and-reasonable standard of proof. See, for example, the contracts construed in *Public Service Co. of New Mexico v. FERC,* 628 F.2d 1267, 1269–70 (10th Cir.1980), *cert. denied,* 451 U.S. 907, 101 S.Ct. 1974, 68 L.Ed.2d 295 (1981) ("This contract, including the tariff made a part hereof, shall at all times be subject to such changes or modifications as shall be ordered from time to time by any legally constituted regulatory body having jurisdiction to require such changes or modifications") and *Louisiana Power & Light Co. v. FERC,* 587 F.2d 671, 675–76 (5th Cir.1979) ("The terms and conditions of this Agreement and Rate Schedule are subject to amendment or alteration as a result of and in accordance with a valid applicable order of any governmental authority having jurisdiction hereof") (emphasis omitted). *See also Missouri Power & Light Co.,* 55 F.P.C. 2693 (1976).

The cases cited by the cities do not support a contrary interpretation. *Richmond Power & Light Co. v. FERC,* 481 F.2d 490 (D.C.Cir.), *cert. denied,* 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973), held only that a contract contemplating supplier-initiated rate changes approved by the state regulatory agency did not permit § 205 rate changes under the Federal Power Act. *Id.* at 499. The other cases involved contractual clauses that referred to future regulatory change in general, not to rate adjustment in particular, and that therefore did not as clearly contemplate governmental participation in the rate-setting process. *See Brief for Petitioners* at 25–26, quoting language from the contracts construed in *FPC v. Sierra Pacific Power Co., supra* ("This

agreement shall at all times be subject to changes and/or modifications as said Commission may from time to time direct in the exercise of its jurisdiction"), and *United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956) ("All of the obligations of the parties hereunder shall be subject to the valid orders of all governmental bodies"). *See also Gulf States Utilities Co. v. FPC, supra,* 518 F.2d at 453 ("agreement 'is subject to all valid laws and governmental regulations' ").

The cities appeal to the canon of construction that a document is to be construed *contra proferentem*—that is, against the interests of the drafting party (here, KG & E). But in the abstract, without reference to the facts that exist at a particular time, the rate revision term is neutral: An interpretation permitting liberal Commission alteration will favor the seller when costs have increased and the buyer when costs have declined. And if the impact of the interpretation is to be computed by reference to the facts at a particular time, that time is not, as the cities suggest, the date when the court comes to interpreting the provision. That would produce a contract with shifting meanings. A lawsuit brought when costs have risen would produce a different contract (construed *contra proferentem*) than one brought later, when costs have fallen. Rather, if the canon requires assessment of the drafter's interest in light of the facts at a particular time, that must be the time when the contract was made. The cities acknowledge that at that time KG & E would have preferred a fixed-rate contract. Thus, if the canon has any force in this case it suggests that the contract did *not* envision the strict public-interest standard for rate changes.

## THE IOLA CONTRACTS

In 1978, the Commission held that the Iola contracts, which had a special provision governing rate changes in their Firm Power Service Schedule (Schedule A), limited changes for firm service to those in the public interest. In Opinion No. 80–B, it

held that rate changes under the Iola contracts for interchange and transmission service (whose rates were specified in other Schedules that did not contain a special rate-change provision) were governed by the just-and-reasonable standard. This conclusion was based on Article IX of the Iola contracts, entitled "Commission and Other Approval," which provides:

This Contract and all obligations hereunder are conditioned upon the valid orders of, and the granting of approval and authorization by, any Commission, or other regulatory body, having jurisdiction or whose approval or authorization may be required by law.

Opinion No. 80–B, 17 FERC (CCH) ¶ 61,180, at 61,342.

The cities challenge this holding on several grounds. First, they contend that it was procedurally precluded, since—contrary to the facts as we have just described them—the 1978 Order adopted a public-interest standard for changes in interchange and transmission service rates as well as for firm service rates, and since this determination bound the Commission in later orders. We cannot find in the record any factual support for this view. The holding of the 1978 Order addressed only the standard applicable to firm power rates. Although that order in passing describes Article IX as "silent as to future rate changes," 2 FERC ¶ 61,095, at 61,228, the basis for its limiting firm power rate changes to those in the public interest was section 4 of Schedule A, which reads:

In the event that the costs of rendering service under this Schedule are materially increased or decreased, either party may request a revision of the rates as set forth in Section 2 at or after the end of the fifth year of the term, but not oftener than once each five years thereafter.

*Id.* at 61,232 n. 15 (emphasis omitted).

Later proceedings before the Commission do not establish that the 1978 Order meant anything else. The ALJ Decision and Opinion No. 80 do not focus on the standard applicable to changes in nonfirm services. At one point, the ALJ makes the general statement that rates under the Iola contracts cannot be increased for failure to meet the *Sierra* burden; ALJ Decision, 7 FERC ¶ 63,051, at 65,254; yet at another, he approves changes "for all economy sales" (which are a nonfirm service). *Id.* at 65,244. In adopting the ALJ's opinion the Commission apparently overlooked that KG & E had proposed rate changes for nonfirm services, saying (quite inconsistently with the ALJ Decision it adopted): "KG & E did not attempt to meet the [*Sierra*] burden with respect to [the Iola] cities, so their contract rates are unaffected by this Order." Opinion No. 80, 10 FERC (CCH) ¶ 61,243, at 61,465 n. 3. Only in *Kansas Gas and Electric Co., Order Accepting for Filing and Suspending Proposed Rates,* 11 FERC (CCH) ¶ 61,221, at 61,440 (May 30, 1980), did the Commission say that rates for interchange and transmission services were governed by the public-interest standard, and that order was itself modified in Opinion No. 80–B.

Moreover, even if Opinion No. 80–B departed from a prior holding in the proceeding, that departure was permissible. Opinion No. 80–B was responding to an application for rehearing, and the statute provides that "[u]pon such application the Commission shall have the power ... to abrogate or modify its order without further hearing," 16 U.S.C. § 825*l*(a). Neither the regulations nor the order cited by the cities limits this power. Section 35.13(g) of 18 C.F.R. (1983) does not speak to the Commission's authority to shift course; it only requires that cost of service data submitted by utilities conform with Commission orders. Likewise, the statement in *Louisiana Power & Light Co.,* 14 FERC (CCH) ¶ 61,075, at 61,128 (Jan. 28, 1981) (footnote omitted), that "substantive ratemaking principles, once established for a particular company, should be continued to be applied [*sic*] in subsequent cases unless there is a supervening change in circumstances or Commission policy requiring a different conclusion," does not prohibit policy shifts made in the course of a proceeding. There, the Commission only granted *stare decisis*

effect to ratemaking principles established in another, completed proceeding.

■ The cities also claim that the Commission's interpretation of the Iola contracts was substantively incorrect. Here again, whatever our own estimations might be as an original matter, we find the Commission's interpretation amply supported. The interpretive factor of central importance is the existence within the contract of two separate provisions bearing upon the rate changes—the very detailed provision of Schedule A, applicable to firm service, and the more general provision of Article IX which, in the absence of any rate-change provision in the Schedules applicable to nonfirm services, governs nonfirm service rate changes. These different clauses must be given their intended effect. It is impossible to compare the two without concluding that the former was intended to impose a more significant contractual restriction upon the ability to alter rates as a result of changed circumstances. This effect is achieved by finding, as the Commission did, that the latter, unlike the former, adopts the more lenient just-and-reasonable standard. It is true that—as we have discussed above in connection with the Bronson and Neodesha contracts—Article IX standing alone, since it deals with regulatory matters in general and not with ratemaking in particular, would not normally be interpreted in this fashion. But when such a provision is combined with a separate provision, applicable to other rates, that clearly contemplates a more stringent standard, it is reasonable to conclude that the just-and-reasonable standard is more faithful to the parties' intent.

### AUTHORITY OF COMMISSION TO CHANGE RATES WITHOUT RESOLVING PRICE SQUEEZE ISSUE

The cities also appeal from another aspect of the Commission's decision. During the ratemaking, they had challenged the new wholesale rates on the ground that they created a "price squeeze." By this they mean that KG & E's wholesale rates (fixed by the Commission) are, without adequate cost justification, so high in comparison with its retail rates (fixed by the state), that they cannot purchase power from KG & E and compete with it for retail customers. The Supreme Court established in 1976 that the existence of a price squeeze is an invalidating discriminatory effect and must be considered by the Commission. *FPC v. Conway Corp.*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976). Nonetheless, in this case the Commission did not resolve the price squeeze issue before allowing the new rates to go into effect, but reserved judgment on the point, stating

> [I]f KG & E will stipulate to collect the approved wholesale rates subject to our authority to order refunds, we will authorize their collection (so conditioned) pending our final disposition of the price squeeze allegations.... We will not ... grant or deny the cities' motion for a refund of the difference between the preceding rates and the rates in the compliance filing at this time. If KG & E stipulates to this procedure, it may retain the difference between those rates subject to our authority to order refunds depending on our final disposition of the price squeeze issue.

Opinion No. 80–B, 17 FERC (CCH) ¶ 61,180, at 61,347–48. The cities assert that this action was impermissible. They argue that if their allegations are true, the new rates are unlawful, and that the Commission therefore cannot allow the new rates to go into effect without resolving the point. We disagree.

We do not share the cities' belief that this question was resolved by the Supreme Court's decision in *FPC v. Conway Corp.*, *supra*. That case involved a quite separate issue: whether allegations of a price squeeze came within the Commission's jurisdiction. The Commission had refused to consider such allegations, because a price squeeze was caused by a difference between rates within its jurisdiction, *i.e.*, wholesale rates which it had the power to set, and rates outside its jurisdiction, *i.e.*, retail rates set by state authorities. The Commission had asserted that it had no authority to

"consider [or] remedy *any* alleged discrimination resting on a difference between jurisdictional and nonjurisdictional rates." *Id.* at 277, 96 S.Ct. at 2003 (emphasis in original). The Supreme Court held otherwise, stating that "[i]f the undue preference or discrimination is in any way traceable to the level of the jurisdictional rate," the Commission has authority and obligation to consider it under the Act. *Id.* In the course of its opinion, it stated that the "Commission must arrive at a rate level deemed by it to be just and reasonable, but in doing so it must consider the tendered allegations that the proposed rates are discriminatory and anticompetitive in effect." *Id.* at 279, 96 S.Ct. at 2004. In the context of the case before it, however, the Court could have had in mind only the Commission's *final* determination of "a rate level deemed by it to be just and reasonable"; the statement cannot reasonably be regarded as bearing upon the necessity of resolving the price squeeze issue before tentatively approved rates may be permitted to go into effect. That issue was not presented or even adumbrated in the facts of the case.

Far from being resolved by Supreme Court precedent, the question whether the Commission can bifurcate a proceeding in this manner is, as far as we are aware, one of first impression. The Supreme Court has, however, approved another manner of separating different phases of a ratemaking proceeding quite analogous to the one used here. *FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942), involved a challenge to ratemaking conducted under § 5 of the Natural Gas Act,[4] which has been found by the Supreme Court to be "substantially identical" to § 206 of the Federal Power Act. *FPC v. Sierra Pacific Power Co., supra,* 350 U.S. at 350, 76 S.Ct. at 369; *see FPC v. Conway Corp., supra,* 426 U.S. at 281, 96 S.Ct. at 2005. The Federal Power Commission had suspended existing rates on finding that they were unjust and unreasonable because they permitted the gas companies to collect a higher than fair overall return. It then issued an interim order instructing the companies to file new rates that would yield a lower overall return, permitting such rates to take effect immediately, without further examination, but leaving the record open for further proceedings. The companies challenged this procedure on the ground, among others, that the Commission had no authority to set rates without passing upon the individual rates rather than merely the overall level of return. *FPC v. Natural Gas Pipeline Co., supra,* 315 U.S. at 583–85, 62 S.Ct. at 741–42. The Supreme Court approved the Commission's action, stating

> The establishment of a rate for a regulated industry often involves two steps of different character, one of which may appropriately precede the other. The first is the adjustment of the general revenue level to the demands of a fair return. The second is the adjustment of a rate schedule conforming to that level so as to eliminate discriminations and unfairness from its details. Such an orderly procedure for establishing the rates prescribed by the Act would seem to be an appropriate means of carrying out its provisions.

*Id.* at 584, 62 S.Ct. at 742. Thus, the Supreme Court permitted the Commission to

---

4. Section 5 provides that

> Whenever the Commission ... shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.

15 U.S.C. § 717d(a) (1982).

reserve for later determination not merely the matter of unduly discriminatory or preferential effect, but even (what is not involved here) the matter of justness and reasonableness of the *individual rates*,[5] as opposed to the overall return. *See also Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978).

The cities contend that *Natural Gas* is distinguishable because § 5 of the Natural Gas Act, which is in other respects similar to § 206 of the Federal Power Act, contains in addition the proviso set forth in note 4, *supra.* They argue that the last clause of that proviso permitted the bifurcated procedure there approved, and was relied upon for that purpose by the Supreme Court. We disagree. The purpose of that clause is simply to permit the Commission to decrease rates without prior filing of a new rate schedule by the gas company, thus creating an exception to (or, more accurately, reiterating the limited scope of) the principal portion of the proviso, which prohibits the Commission from increasing rates without prior filing. It has nothing to do with the standards to be used by the Commission or the degree of scrutiny to be applied. It therefore had no bearing upon approval of the new rates *without individualized examination,* but rather went to a quite separate point that had also been contested by the gas companies, to wit: approval of the rates *without a prior rate filing.* (That issue, of course, is not present in this case, since § 206 contains no restriction similar to the main portion of the proviso and since the Commission has in any case approved specific rates proposed by KG & E.) While the Supreme Court's opinion does not neatly separate the two distinct points, it is clear enough that the proviso was not meant to be its basis for resolution of the bifurcation issue. For the principal authority the Court cited in resolving that issue was the *New*

*England Divisions Case,* 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605 (1923), a case under the Interstate Commerce Act, whose relevant provisions did not contain a proviso like the one in § 5. *See* Interstate Commerce Act of 1887, ch. 104, §§ 13 & 15, 24 Stat. 383 & 384, as amended by Act of June 29, 1906, ch. 3591, § 4, 34 Stat. 589, as amended by Act of June 18, 1910, ch. 309, §§ 11 & 12, 36 Stat. 550 & 551, as amended by Transportation Act of 1920, ch. 91, §§ 416 & 418–421, 41 Stat. 484–488 (current versions codified at 49 U.S.C. §§ 13 & 15 (1976)). Indeed, the Court specifically stated that § 5 was "modelled on" those provisions, *FPC v. Natural Gas Pipeline Co., supra,* 315 U.S. at 584, 62 S.Ct. at 742—which would make no sense if the proviso that distinguished the two were central to the case.

The Commission's reason for acting as it did in *Natural Gas* is obvious: It was attempting to avoid unjust enrichment. The companies were seeking to delay a rate reduction whose necessity had already been determined until a full examination of the individual new rates could be completed, in order to reap the benefit of the unjust and unreasonable higher rates in the interim. The same problem exists here in reverse: The cities are trying to keep in effect rates that have already been determined to be unjustly and unreasonably low until the lengthy process of resolving the price squeeze issue is completed. It is not the case, as the cities have asserted, that unjustness and unreasonableness cannot be determined *until* the price squeeze finding is made. The teaching of *FPC v. Conway Corp., supra,* is to the contrary:

> [T]here is no single cost-recovering rate, but a zone of reasonableness: "Statutory reasonableness is an abstract quality represented by an area rather than a pinpoint. It allows a substantial spread be-

---

5. *See* R. Pierce, G. Allison & P. Martin, *Economic Regulation: Energy, Transportation and Utilities* 315 (1980):

> A. Aggregate Versus Specific Reasonableness
> Determining whether rates are set at a lawful level starts with the problem of ensuring that in the aggregate the approved rates give

> the company a reasonable opportunity to cover its operating costs and have enough left over with which to attract capital. This problem has been dealt with earlier .... [The present] section focuses on the criteria by which individual rates can be adjudged just and reasonable.

tween what is unreasonable because too low and what is unreasonable because too high." *Montana-Dakota Util. Co. v. Northwestern Pub. Serv. Co.,* 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951).... The Commission must arrive at a rate level deemed by it to be just and reasonable, but in doing so it must consider the tendered allegations that the proposed rates are discriminatory and anticompetitive in effect.

We think the Court of Appeals was quite correct in concluding:

> When costs are fully allocated, both the retail rate and the proposed wholesale rate may fall within a zone of reasonableness, yet create a price squeeze between themselves. There would, at the very least, be latitude in the FPC to put wholesale rates in the lower range of the zone of reasonableness, without concern that overall results would be impaired....

426 U.S. at 278–79, 96 S.Ct. at 2004–05. Thus, price squeeze goes not to the reasonableness of the rates, but to their discriminatory or preferential character, and affects *where within the zone of reasonableness* the proper rate should be fixed. But if the Commission has already determined that an existing rate is outside the zone of reasonableness, the presence of a price squeeze can in no way bring the rate back into that zone;[6] and if it has fixed a new rate that is just and reasonable, the presence of a price squeeze can in no way cause it not to be so.

*Conway* simply requires the Commission to consider price squeeze among other issues of undue discrimination or preference which it considers in fixing precise rates within the zone of reasonableness. Once that is understood, it becomes apparent that the reasons for separating the just-and-reasonable and price squeeze inquires are comparable to—and indeed stronger than—the

reasons for separating the setting of overall return and individual rates in a case like *Natural Gas.* If, as *Natural Gas* observes, the fixing of individual just-and-reasonable rates must logically be preceded by establishment of a just-and-reasonable overall return, the determination regarding price squeeze must be preceded not only by that, but by establishment of proposed just-and-reasonable individual rates as well. It is a *third* stage in the process. Since it pertains to the relationship among individual rates, it cannot be made until both the overall return and the proposed (just-and-reasonable) individual rates have been specified. *See Cities of Batavia, supra,* 672 F.2d at 88–89; 18 C.F.R. § 2.17 (1983); *Public Service Co. of New Mexico,* 17 FERC (CCH) ¶ 61,123 (Nov. 9, 1981). If the avoidance of unjust enrichment justified the Commission in *Natural Gas,* once the overall return had been found unjust and unreasonable, in implementing immediately provisional new rates that might or might not have been individually just and reasonable; then even more so here, where *both* the overall return had been found unjust and unreasonable *and* the individual new rates had been found just and reasonable (there is no allegation in this appeal that any of them provides an unfair level of compensation), the Commission should be able to give those new rates interim effect. Waiting was no more a feasible option here than in *Natural Gas,* because the complexity of the next phase of the investigation would have produced a long delay. To hold otherwise would not only risk unjust enrichment of KG & E's customers at the expense of KG & E in the present case; it could have the long-term effect of enabling wholesale purchasers such as the cities to obtain more favorable rate treatment at the expense of the suppliers' retail customers. The wholesalers' ability, by raising the price-squeeze issue, to delay a concededly necessary rate

6. If it were otherwise, the Commission would in every § 206 proceeding seeking adjustment of particular wholesale rates (as opposed to adjustment of overall rate of return) have to make *two* price squeeze determinations: not merely the price squeeze determination on the basis of the proposed new rates, in order to

ascertain (according to petitioners) their justness and reasonableness, *see Cities of Batavia, supra,* but also a price squeeze determination on the basis of the *existing* rates, before the Commission could set them aside as unjust and unreasonable.

increase for an extensive period of time would give them a potent weapon for exacting, as the price of their acquiescence, a structure of proposed rates that derives a higher share of the suppliers' allowed return from retail purchasers.

The likelihood that the interim arrangement put in place by the Commission will produce what ultimately is shown to be the correct result is much greater here than in *Natural Gas,* since only a single factor possibly requiring adjustment in the new rates (price squeeze) is at issue. And even if that single factor is found to exist, it does not necessarily require adjustment. The new rates need not, and indeed cannot, be changed if they have already been set at the lower end of the zone of reasonableness. Moreover, since *Conway* merely holds that the Commission must weigh anticompetitive effects along with other factors in setting rates, 426 U.S. at 278–79, 96 S.Ct. at 2004–05, it is not clear that even a downward adjustment *within* the zone of reasonableness is invariably required. When one adds the further consideration that any downward adjustment, if there is one, need not necessarily go (and seems unlikely to go) to the level of existing wholesale rates, the chances that retaining the existing rates in effect will achieve interim justice, even between KG & E and these petitioners, are much less than the chances that applying the new rates will do so. The calculus is placed beyond all doubt and beyond all reason when it is further appreciated that keeping the old rates in effect for petitioners means keeping them in effect *for all ratepayers.* Until the price squeeze determination has been made, the Commission has no lawful basis for putting into effect a structure that increases rates for some but not all purchasers; for if that were done the same absence of finding that petitioners rely upon would, if we give it credence, provide other purchasers like ground for

invalidating *their* new rates as unduly discriminatory. Thus, in addition to creating what is most probably a more equitable interim arrangement, pending the price squeeze determination, between KG & E and these petitioners, the course of action chosen by the Commission produces what is unquestionably a more equitable interim arrangement between KG & E and its other customers. The petitioners' approach would retain the old rates in effect even where there is no question that they should be higher.

The Commission's action here not only has as much support in reason as the FPC's action in *Natural Gas,* it has even *more* support in the text of the statute. Section 206 of the Federal Power Act permits the Commission to set aside rates on the ground that they are "unjust, unreasonable, unduly discriminatory or preferential." But to approve new rates the Commission need only find that they are "just and reasonable." [7] The contents of the terms "unjust and unreasonable," on the one hand, and "unduly discriminatory or preferential," on the other, are quite different. As described in a leading textbook on the subject:

> While many courts and regulatory agencies confuse the concepts of just and reasonable rates and nondiscriminatory rates, each concept deals with a separate rate issue. The setting of nondiscriminatory rates concerns the issue of whether different rates are being charged for the same service, whereas the setting of just and reasonable rates concerns the issue of whether rates are set at a lawful level. Therefore, just and reasonable rates may be discriminatory, and nondiscriminatory rates may not be just and reasonable.

R. PIERCE, G. ALLISON & P. MARTIN, *Economic Regulation: Energy, Transportation and Utilities* 315 (1980). As noted earlier, rates

---

7. The omission of the additional terms "not unduly discriminatory or preferential" in the requirements for new rates was not accidental. It traces back to the Interstate Commerce Act, where it reflected a congressional intent that the ratemaking agency was not to take an active role in establishing the relative level of

rates among ratepayers, as opposed to assuring the compensatory level of rates. *See, e.g.,* 40 Cong.Rec. 1766 (1906). While that original congressional understanding has undoubtedly changed over the years, we do not think it proper to deprive the difference in requirements of all meaning.

that produce a price squeeze are unlawful because they are "unduly discriminatory or preferential," not "unjust and unreasonable." *FPC v. Conway Corp., supra,* 426 U.S. at 278–79, 96 S.Ct. at 2004–05. Therefore the literal text of the statute is not violated by what has occurred here: the setting aside of old rates that were "unjust and unreasonable" and the fixing of new ones that have been determined to be "just and reasonable", though not yet determined to be "nondiscriminatory and nonpreferential."

This is not to say that the Commission can totally ignore discriminatory effects in general, and anti-competitive effects in particular, in the process of approving or fixing new rates. It assuredly cannot. *FPC v. Conway Corp., supra.* To prescribe rates that are known to be unduly discriminatory or preferential is to prescribe rates that are known to be unlawful, which would be a violation of the Commission's responsibilities. But the absence of a positive obligation imposed on the Commission to assure itself that new rates are not unduly discriminatory or preferential as well as just and reasonable does, we think, at least give it some discretion in determining the timing of the former inquiry. In the ordinary case, both the public interest and economy of agency resources will require that inquiry to be conducted simultaneously with the just-and-reasonable inquiry, ·prior to even provisional rate approval. Inquiry into price squeeze allegations, however, presents an unusual situation. As noted above, agency resources cannot be saved by making the determination on that issue simultaneously with the determination on the justness and reasonableness of the rates, since the price squeeze cannot be evaluated until the just and reasonable rates are known; and the public interest may be substantially disserved by the lengthy delay that the price squeeze investigation entails.

The same combination of technical compliance with the language of the statute plus unusual circumstances justifying departure from the agency obligations ordinarily implied by such language, was the basis of the Supreme Court's decision in the *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). There the Federal Power Commission was permitted, when prescribing area-wide rates for the first time under § 5(a) of the Natural Gas Act, to impose a moratorium upon individual rate increases for a period of two and a half years—despite the Act's provision for the filing of rate increases that could only be suspended by the Commission for a period not to exceed five months. The Court noted that the filing provision "merely requires notice to the Commission as a condition of any modification of existing rates; it provides that a 'change *cannot* be made without the proper notice to the Commission; it does not say under what circumstances a change *can* be made.'" *Id.* at 779, 88 S.Ct. at 1366, *quoting from United Gas Pipe Line Co. v. Mobile Gas Service Corp., supra,* 350 U.S. at 339, 76 S.Ct. at 378 (emphasis in original). But in adopting this Portia-like interpretation, the Court made it very clear—as we have done here—that it was scrutinizing the use of this technically permitted procedure carefully, to be sure that it was "a permissible exercise", concluding that "[w]e hold only that this relatively brief moratorium did not, in the circumstances here presented, exceed or abuse the Commission's authority." *Id.* 390 U.S. at 781, 88 S.Ct. at 1367. In addition, the area-wide rates in *Permian Basin* were approved by the Commission even though it acknowledged that, as applied to some producers, they would not be just and reasonable. The rates were nonetheless upheld by the Supreme Court since provision had been made for "appropriate relief" to such producers. 390 U.S. at 770–71, 88 S.Ct. at 1361–62. In its essentials, that situation is indistinguishable from the present case. The *Permian Basin* case was relied upon by the Court in *American Commercial Lines, Inc. v. Louisville & Nashville R.R.,* 392 U.S. 571, 592–93, 88 S.Ct. 2105, 2116–17, 20 L.Ed.2d 1289 (1968), to justify what was in effect the Interstate Commerce Commission's temporary disapproval of a rate filing while it

was considering in a pending rulemaking the ratemaking theory (out-of-pocket cost instead of fully distributed cost as the basis of evaluating inter-modal cost advantage) upon which the rate was assertedly based. There, as here, the agency chose to implement, on an interim basis, a determination which it acknowledged was not yet based upon full consideration and was therefore provisional; and here, as there, both the precise language of the statute and unusual circumstances sustained the practice.

We hold, therefore, that it is both permissible under the terms of the statute and within the bounds of sound discretion for the Commission to make just and reasonable rates provisionally effective, with provision for refund, pending resolution of a price squeeze claim.

\* \* \* \* \* \*

Since we find no basis for setting aside either the Commission's interpretation of the relevant contracts or its setting of rates subject to later disposition of the price squeeze issue, the petition for review is

*Denied.*