918 F.2d 225
 287 U.S.App.D.C. 19
 Unpublished Disposition
NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
WISCONSIN PUBLIC POWER INCORPORATED SYSTEM, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
 No. 89-1636.
 United States Court of Appeals, District of Columbia Circuit.
 Nov. 27, 1990.
 
 Before WALD, Chief Judge, and D.H. GINSBURG and RANDOLPH, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This case was considered on petition for review of an order of the Federal Energy Regulatory Commission. The Court has determined that the issues presented occasion no need for a published opinion. See D.C.Cir. Rule 14(c). For the reasons set forth in the accompanying memorandum, it is
 
 
 2
 ORDERED AND ADJUDGED, by the Court, that the petition for review of an order of the Federal Energy Regulatory Commission be denied.
 
 
 3
 The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir. Rule 15.
 
 MEMORANDUM
 
 4
 Wisconsin Public Power Incorporated ("WPPI") petitions for review of a Federal Energy Regulatory Commission ("FERC" or "the Commission") order interpreting a Transmission Service Agreement under which WPPI agreed to purchase and Wisconsin Electric Power Company ("WEPCO") agreed to sell electric power transmission service. WPPI also contends that WEPCO has applied its transmission service tariff in a discriminatory and anticompetitive manner. We hold that (1) FERC's interpretation of the Agreement is reasonable; (2) WEPCO's application of its tariff is not unduly discriminatory; and (3) WEPCO has not engaged in anticompetitive conduct. Accordingly, we deny WPPI's petition for review.
 
 I. BACKGROUND
 
 5
 Respondent-intervenor WEPCO is a public utility serving portions of Wisconsin and Michigan. Petitioner WPPI was organized by twenty-six municipal electric systems for the purpose of obtaining electric service. Wisconsin Electric Power Company, 46 F.E.R.C. p 61,019 at 61,108 (1989). Because WPPI does not own any generating facilities, it purchases power from other utilities. In 1980, WEPCO filed with FERC a tariff governing wholesale power supply and transmission services to WPPI. Although WEPCO offers five separate services pursuant to this tariff, only the transmission service is involved in this case. As specified in the tariff, WEPCO offers transmission service under a rate schedule that consists of several documents: (1) a Service Agreement; (2) Exhibit A, which specifies the rates for the service; (3) Exhibit B, which specifies the terms and conditions for the service; and (4) Exhibit C, which contains conditions specific to the particular transmission service rendered.
 
 
 6
 In 1983, WEPCO and WPPI executed a Transmission Service Agreement ("Agreement" or "contract"), which contained the above-listed documents. The two disputes involved in this case arose in 1985 when WPPI requested that WEPCO provide specific transmission services. Although the facts are different, both disputes involve essentially the same question of contract interpretation: does the contract give WPPI, in its use of firm transmission service, the right to substitute suppliers or points of delivery without incurring any additional charge? The first dispute involves the transmission of 10 megawatts ("MW") of power that WPPI purchases from Cliffs Electric Service Company ("Cliffs") for the municipalities of Kaukauna and Menasha (collectively "K-M"). In order to transmit this power from Cliffs to K-M, WPPI purchased firm transmission service[1] from WEPCO. During times when WEPCO was not transmitting Cliffs power to K-M, WPPI sought to substitute nonfirm energy from other suppliers, which FERC treated as a request for an additional nonfirm transmission service.[2] WEPCO refused to allow this substitution. WEPCO maintains that the substitution of energy sources is a separate "transaction" within the meaning of the Agreement, requiring an additional payment. Wisconsin Electric, 46 F.E.R.C. at 61,109.
 
 
 7
 The second dispute involves the transmission of 5 MW of power that WPPI purchases from Cliffs for its members in Wisconsin Public Service Company's ("WPS") service territory. WEPCO agreed to provide firm transmission service to transmit this power from Cliffs to WPS. At certain times, WPPI sought to have power from Cliffs directed to K-M instead of to WPS. WEPCO refused to redirect the delivery of power in this way without additional charge. WEPCO argues that under the contract the minimum duration for a transaction is one day; thus, if WPPI schedules delivery to WPS and K-M during the same day, it undertakes two separate transactions, even if the total demand on WEPCO's system during any given hour does not exceed 5 MW. Id.
 
 
 8
 Because the parties could not resolve their disputes over these issues, WPPI, under protest, accepted transmission service pursuant to WEPCO's interpretation of the contract. This litigation followed.
 
 II. THE AGREEMENT
 A. The Contract Language
 
 9
 The Service Agreement provides that "[t]he Company [WEPCO] agrees, subject to availability, to furnish transmission service to the Customer [WPPI], and the Customer agrees to purchase and pay for such service" subject to the terms set forth in Exhibits A, B, and C. J.A. at 484. The resolution of the contract dispute in this case turns on the interpretation of several sections of the Exhibits. First, the "availability" clause in Exhibit A provides:
 
 
 10
 Service hereunder is available to municipalities, municipal electric companies, rural electric cooperatives, and investor-owned utilities over the Company's facilities to or from existing points of delivery and other such points on the Company's interconnected system as may be agreed by the Company and the Customer. Transmission service, both firm and non-firm, is available where and so long as Company facilities have adequate capacity to permit the transaction requested by the Customer.
 
 
 11
 J.A. at 486.
 
 Second, Exhibit C states:
 
 12
 It is the intent of the Company and the Customer that transmission transactions under this Agreement be arranged between them as the opportunity for them occurs and as they serve the parties' mutual benefit. Specific firm transactions for time periods of one year or less and all non-firm transactions may be arranged orally, unless either party requests written agreement or confirmation. Specific firm transactions for time periods of more than one year shall be covered by the execution of a Supplement to this Exhibit C.
 
 
 13
 J.A. at 500.
 
 
 14
 Third, the "rates" clause in Exhibit A provides that service "shall be billed at the aggregate of the charges set forth below for delivery point(s) specified in Exhibit C."[3] J.A. at 487. Finally, if firm transmission service "is made available under a commitment for periods of less than one month," it is billed on a daily (rather than monthly) basis. Id.
 
 B. FERC's Interpretation of the Agreement
 
 15
 After quoting much of the contract language recited above, the Commission adopted WEPCO's interpretation of the contract. The Commission reasoned that:
 
 
 16
 Read together, Exhibits A and C indicate that firm transmission and nonfirm transmission are distinct services, each charged separately from the other. The exhibits likewise indicate that individual transactions are distinct, so that a different supplier, for example, would result in a different transaction. Similarly, a change in delivery points changes the operation of the system.... The contract, in Exhibits A and C, merely reflects the fact that as suppliers change or as delivery points change the transactions themselves change, warranting separate additional charges. In short, we believe that the correct interpretation of the parties' agreement is that each change in service type (i.e., firm or nonfirm) or in supplier must be agreed to by WEPCO and represents a separate transmission transaction to be separately charged to WPPI.... There is nothing in the transmission service contract which creates a right to an undivided portion of WEPCO's transmission system.
 
 
 17
 Wisconsin Electric, 46 F.E.R.C. at 61,112.
 
 
 18
 The Commission reiterated this reasoning in its denial of WPPI's petition for rehearing. Wisconsin Electric Power Company, 48 F.E.R.C. p 61,247 at 61,859 (1989). The Commission also disagreed with WPPI's characterization of the issue as whether WPPI has the right to schedule different power resources in the use of its firm transmission service. A change in suppliers, delivery points, types of service, or scheduling frequencies, the Commission found, is "not merely a question of scheduling." Id. "Rather, it is a question of whether WPPI can change in a fundamental way the service WEPCO is providing and so obtain other, additional service without any additional charge." Id.
 
 C. Analysis
 
 19
 "It is the settled law of this circuit that substantial deference is accorded to the Commission's interpretation of utility contracts; we ask only whether that interpretation is 'amply supported both factually and legally.' " Vermont Dept. of Public Service v. FERC, 817 F.2d 127, 134 (D.C.Cir.1987) (citing Kansas Cities v. FERC, 723 F.2d 82, 87 (D.C.Cir.1983). Because we find that the Commission has amply supported its interpretation of the Agreement, we deny WPPI's petition for review.
 
 
 20
 As noted above, Exhibit C states the parties' intent "that transmission transactions under this Agreement be arranged between them as the opportunity for them occurs and as they serve the parties' mutual benefit." J.A. at 500. Although the Agreement does not define the term "transmission transaction," we find the Commission's conclusion that the parties intended that a change in suppliers or points of delivery gives rise to a separate transaction is a rational one. The Administrative Law Judge ("ALJ") found that the substitute energy transmissions "occur at different times [and] use different transmission facilities." Wisconsin Electric Power Company, 40 F.E.R.C. p 63,007 at 65,061 (1987). The Commission agreed, stating that the substitute energy transmissions "change[ ] the operation of the system." Wisconsin Electric, 46 F.E.R.C. at 61,112. We find these changes in the requested services sufficient to support FERC's determination that multiple transactions were involved. We also agree that the fact that Exhibit C requires the identification of the "Customer" and the "Customer's Power Supplier" for each transmission transaction indicates that a change in the power supplier creates a separate transaction. See id.
 
 
 21
 WPPI challenges this interpretation and argues that the Commission should have construed the Agreement against the drafter, WEPCO. But as the Commission noted, "[t]he mere fact that WEPCO may have drafted the contract does not automatically dictate its interpretation against WEPCO and for WPPI. Contra proferentum has never been and is not now the sole guide to interpretation." Wisconsin Electric, 48 F.E.R.C. at 61,858 n. 6.
 
 
 22
 WPPI also asserts that WEPCO, by refusing to allow WPPI to substitute suppliers or change delivery points, is imposing point-to-point limitations on transmission service. WPPI argues that the contract does not allow WEPCO to impose point-to-point limitations on service because the transmission service rates in the tariff are "postage stamp" rates--that is, the rates are not dependent upon where the energy enters or leaves WEPCO's transmission system. The Commission rejected this argument, however, concluding that "the general form of the rate does not independently establish any rights other than those specifically agreed to in the contract." Wisconsin Electric, 48 F.E.R.C. at 61,860. The Commission's distinction between the form of the rates and the terms of the contract is reasonable and supported by the evidence in the record. A member of FERC's staff testified that "[t]he rights of the customer to service are established by the terms of the contract between the utility and the customer." J.A. at 401. More importantly, because he also testified that the postage stamp rate design is the rate design traditionally employed by FERC in transmission ratemaking, J.A. at 402, we do not believe that the rate design has any particular relevance to the parties' intent about the meaning of the contract terms. We therefore conclude that the Commission reasonably rejected WPPI's argument that the adoption of a postage stamp rate implies that the contract prohibits WEPCO from imposing point-to-point limitations on transmission service.
 
 
 23
 III. UNDUE DISCRIMINATION AND ANTICOMPETITIVE CONDUCT
 
 
 24
 WPPI also challenges WEPCO's actions as unduly discriminatory and anticompetitive within the meaning of Sec. 205(b) of the Federal Power Act, 16 U.S.C. Sec. 824d(b). This section reviews those claims in turn.
 
 
 25
 A. Undue DiscriminationWPPI argues that WEPCO's application of its tariff is unduly discriminatory for two reasons. First, WPPI contends that WEPCO's restrictions favor firm power customers over firm transmission customers. Unlike firm transmission customers, firm power customers purchase from WEPCO not only firm transmission service, but also distribution services and the power itself. WEPCO substitutes energy resources (e.g., its own generating capacity and its purchases of electricity from other utilities) to minimize the cost to firm power customers. But WEPCO does not allow firm transmission customers to use the WEPCO system to substitute energy sources to minimize their power costs. This is discriminatory, WPPI alleges, because the firm power customer pays the same rate for use of WEPCO's transmission services that the firm transmission customer pays. Wisconsin Electric, 46 F.E.R.C. at 61,113.
 
 
 26
 The Commission disagrees and challenges the premise of WPPI's argument. The Commission maintains that the relationship between WEPCO and its firm power customers is not comparable to that between WEPCO and its firm transmission customers. Because firm power and firm transmission relationships are not comparable, the Commission reasons, the difference in WEPCO's treatment of the two groups of customers cannot be the basis for a claim of discrimination.
 
 
 27
 We find the Commission's reasoning sound. As the Commission recognized,
 
 
 28
 What WEPCO provides its requirements customers is electric energy, not the separate services of generation/purchase, transmission and distribution. What WEPCO provides WPPI is transmission service, something quite different.... What WEPCO does in order to serve its requirements customers is done internally on its own behalf to meet its own obligations; what WEPCO does to provide transmission service to WPPI is done for WPPI so that WPPI can meet WPPI's obligations. What WEPCO offers its requirements customers is the end product, electric energy, while what WEPCO offers WPPI is merely a discrete service, transmission service.
 
 
 29
 Id. at 61,115. Accordingly, we accept as reasonable the Commission's conclusion that "WPPI cannot unbundle WEPCO's functions to argue that WEPCO's service is unduly discriminatory." Id; see also Wisconsin Electric, 48 F.E.R.C. at 61,861.
 
 
 30
 Even assuming that it is appropriate to compare the treatment of firm power and firm transmission customers, we are not persuaded that WPPI is discriminating against firm transmission customers. Instead, we think the record supports the Commission's finding that "[i]n paying for firm power, which includes payment for the transmission component of firm service, power customers are not entitled to general use of WEPCO's transmission facilities on their own behalf. Thus, in contrast with WPPI's claim, power customers do not receive a benefit denied WPPI as a firm transmission customer." Wisconsin Electric, 46 F.E.R.C. at 61,115.
 
 
 31
 Second, WPPI asserts that WEPCO has discriminated against WPPI because WPPI obtains its power from other utilities rather than from its own generating capacity. In particular, WPPI contends that WEPCO allowed Wisconsin Power and Light ("WP & L"), a utility with its own generating capacity, to designate itself as both the "Customer" and the "Customer's Power Supplier" of one firm transmission service transaction and, therefore, to substitute power resources without additional charge. We need not decide the merits of this claim, however, because we agree with the Commission that WEPCO's agreement to treat WP & L and WPPI consistently makes the claim moot. See Wisconsin Electric, 46 F.E.R.C. at 61,116; Wisconsin Electric, 48 F.E.R.C. at 61,862 & n. 43 ("WEPCO's commitment to apply its transmission service agreements with WPPI and WP & L consistently is a part of the WEPCO/WPPI Service Agreement on file with the Commission.").[4]
 
 B. Anticompetitive Conduct
 
 32
 WPPI also claims that by charging WPPI for changing suppliers or points of delivery, WEPCO is using its control of transmission facilities to increase its sales of bulk power and create barriers to entry. Again we agree with the Commission that the record does not support WPPI's claim. WPPI has not identified any evidence suggesting that the Commission erred in finding that WEPCO's long history of fair dealing with WPPI, its offer to provide a wide range of transmission services, and the relatively small amount of money in dispute negate WPPI's claim that WEPCO harbors anticompetitive intent or has engaged in anticompetitive behavior. See Wisconsin Electric, 46 F.E.R.C. at 61,116.
 
 IV. CONCLUSION
 
 33
 Because we find that the Commission's interpretation of the Agreement is reasonable and because the record does not support WPPI's assertion that WEPCO has applied its tariff in an unduly discriminatory or anticompetitive manner, we deny the petition for review.
 
 
 34
 It is so ordered.
 
 
 
 [1]
 Exhibit A of the Agreement defines "firm transmission service" as "that type of transmission service which is supplied on a continuous availability basis and can only be curtailed or interrupted in emergencies caused by events and circumstances beyond the control of the Company...." Joint Appendix ("J.A.") at 488
 
 
 [2]
 Exhibit A of the Agreement defines "non-firm transmission service" as "that type of transmission service which is interruptible at the sole option of the Company. Non-Firm Transmission Service is available at hours specified by the Company. Non-Firm Service is not available for transmission of firm power." J.A. at 488
 
 
 [3]
 The contract calculates rates on a per month basis and establishes higher rates for firm transmission service than for nonfirm service
 
 
 [4]
 We note, moreover, that the Commission stated that "[s]hould WEPCO violate its filed rate, and the Commission find that WEPCO is engaging in an unduly discriminatory practice, this proceeding and the orders issued in this proceeding would not prejudice a claim for relief or a finding that relief was warranted." Wisconsin Electric, 48 F.E.R.C. at 61,862