McELROY ELECTRONICS
CORPORATION,
Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Los Angeles SMSA Limited Partnership;
Ameritech Mobile Communications,
Inc.; McCaw Cellular Communications,
Inc., Intervenors.

JAJ CELLULAR, Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Los Angeles SMSA Limited Partnership;
Ameritech Mobile Communications,
Inc.; United States Telephone Associa-
tion; Rochester Telephone Mobile
Communications; National Telephone
Cooperative Association; Metro Mobile
CTS, Inc.; McCaw Cellular Communi-
cations, Inc., Intervenors.

LOS ANGELES SMSA LIMITED
PARTNERSHIP, Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

McCaw Cellular Communications,
Inc., Intervenor.

PRICE COMMUNICATIONS
CELLULAR, INC.,
Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

National Telephone Cooperative Associa-
tion; Ameritech Mobile Communica-
tions, Inc.; ALLTEL Mobile Communi-
cations, Inc.; US WEST NewVector

Group, Inc.; BellSouth Corporation;
McCaw Cellular Communications, Inc.;
New Par; Cellular Communications of
Puerto Rico, Inc., Intervenors.

Nos. 91–1545, 91–1552 and 91–1606.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 4, 1993.

Decided April 23, 1993.

Louis Gurman, with whom William D. Silva, Shaun A. Maher, Jerome K. Blask and Coleen M. Egan, Washington, DC, were on the joint brief, for appellants McElroy Electronics Corp. and JAJ Cellular.

Anne P. Jones, with whom David A. Gross, Washington, DC, was on the brief, for appellant Los Angeles SMSA Ltd. Partnership.

Lawrence Roberts, Washington, DC, for appellant Price Communications Cellular, Inc.

Roberta L. Cook, Counsel, F.C.C., with whom Renee Licht, Acting Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., Catherine G. O'Sullivan and Andrea Limmer, Attorneys, Dept. of Justice, Washington, DC, were on the brief, for appellee.

Alfred W. Whittaker and Mitchell F. Hertz, Washington, DC, entered appearances for intervenor Ameritech Mobile Communications, Inc.

Anne P. Jones, Washington, DC, entered an appearance for intervenor Los Angeles SMSA Ltd. Partnership.

R. Michael Senkowski, Washington, DC, entered an appearance for intervenor McCaw Cellular Communications, Inc.

Martin T. McCue, Washington, DC, entered an appearance for intervenor U.S. Telephone Ass'n.

Michael J. Shortley, III, Washington, DC, entered an appearance for intervenor Rochester Telephone Mobile Communications.

David Cosson and L. Marie Guillory, Washington, DC, entered appearances for intervenor Natl. Telephone Co-op. Ass'n.

Stuart F. Feldstein, Washington, DC, entered an appearance for intervenor Metro Mobile CTS, Inc.

Carolyn C. Hill, Washington, DC, entered an appearance for intervenor ALLTEL Mobile Communications, Inc.

Leon T. Knauer, Washington, DC, entered an appearance for intervenor US WEST NewVector Group, Inc.

William B. Barfield and M. Robert Sutherland, Atlanta, GA, entered appearances for intervenor BellSouth Corp.

Thomas J. Casey and Jay L. Birnbaum, Washington, DC, entered appearances for intervenors New Par and Cellular Communications of Puerto Rico, Inc.

Before MIKVA, Chief Judge, WALD and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

These consolidated cases involve what could be considered the "second wave" of cellular licenses in metropolitan areas. Over a decade ago, the Federal Communications Commission ("FCC" or "Commission") launched its "initial" cellular licensing period, during which it granted licenses and permits primarily to companies committed to serving the larger part of a standard metropolitan statistical area ("MSA"), and permitted those companies to expand within their service areas, largely free from competition, for a period of five years. According to the Commission's scheme, after this five-year expansion period, which ran from the grant of the first construction license in each MSA, competitors would be permitted to file applications to serve areas within the MSA that were not being served by the incumbent.

The petitioners in this action, McElroy Electronics Corporation ("McElroy"), JAJ Cellular ("JAJ"), Price Communications Cellular Inc. ("Price"), and Los Angeles SMSA Limited Partnership ("L.A. Partnership"), are companies that filed applications to serve unserved areas in targeted MSAs a little more than five years after the grant of the first construction license in that MSA. The Commission returned those applications as "premature." While not disputing that the requisite five years had passed, the Commission found the applications untimely because it had neither given the notice of the date certain for filing in each MSA that it had announced that it would give, nor established procedures for accepting, processing and selecting the applications. At the heart of this dispute is whether a 1987 Commission order can reasonably be construed to give adequate notice that applications for unserved areas could not be filed after five years had lapsed but before the Commission had announced that it would receive applications. Because we conclude that even a careful reader of the order in question could not have been expected to understand that a further announcement by the Commission was a condition precedent to any applicant's filing of an unserved area application, we remand with instructions to reinstate the applications of at least three of the petitioners *nunc pro tunc.* An agency cannot ignore its primary obligation to state its directives in plain and comprehensible English. When it does not live up to this obligation, we will not bind a party by what the agency intended, but failed to communicate. We do not reach petitioners' other challenges, which are briefly described below.

### I. BACKGROUND

#### A. *General Background*

When the FCC started granting licenses for cellular communications, it undertook to do so in two (somewhat overlapping) steps. Its first priority was to receive and process applications for the initial licenses, primarily from firms wanting to serve all or a core part of an MSA. Each such applicant had to define as its service area

(or Cellular Geographic Service Area ("CGSA")) a substantial part of that MSA.[1] These first licensees were selected through a streamlined comparative "paper hearing" for the thirty largest MSAs, and by lottery for the rest. For the ninety largest MSAs, the Commission adopted special filing and cut-off procedures, including specified dates for filing, which were designed to reduce administrative burdens, permit orderly processing of applications, and discourage applicants from reading and copying competitors' proposals. *Cellular Reconsideration Order*, 89 F.C.C.2d 58, 87–88 (1982).

The Commission's second focus has been to accept and process applications for areas within an MSA that are not being served by the initial licensee; these applications have been termed "fill-in" applications, as they generally fill in around the initial CGSA, serving fringe areas or pockets.[2] For the top 90 MSAs, the Commission received these "fill-in" applications on the due date for the initial MSA applications. Once the FCC expanded beyond these 90 MSAs, however, it postponed an opening date for the filing of such supplementary applications by nonincumbents. *Amendment of the Commission's Rules to Allow Random Selection or Lotteries*, 98 F.C.C.2d 175, 205 (1984) (*"Cellular Lottery Rulemaking"*). In 1986, the Commission initiated a notice and comment rulemaking to determine when it should allow nonincumbents to compete with incumbents seeking to expand their CGSAs. *Amend-*

*ment of the Commission's Rules for Rural Cellular Service (Further Notice of Proposed Rulemaking)*, 1 F.C.C.Rcd. 499 (1986). In 1987, it declared that the "fill-in period" during which existing licensees or permittees could expand service within their CGSAs or expand their CGSAs within their MSAs, without competing applications, would last five years. *See Second Report and Order*, 2 F.C.C.Rcd. 2306, 2309 (April 1987) (*"Second Report and Order"*). The expansion period for each MSA was set at five years from the grant date of the first construction permit in that MSA. *Id.* This "fill-in" or "expansion" period for existing licensees was promoted by the FCC as the most efficient and expeditious means to get cellular service to the public and to permit the incumbents "to adjust their systems to meet unpredicted and unforeseen technical changes and market forces," *id.* at 2308. This court upheld virtually all of this application scheme. *Maxcell Telecom Plus, Inc. v. FCC*, 815 F.2d 1551, 1560–61 (D.C.Cir.1987).

The order announcing this rule, the so-called *Second Report and Order*, is at the heart of this dispute, so it bears quoting at some length. First, it announced the modification of the Commission "fill-in" rule to state:

Notwithstanding any other provision of this rule section and rule provision of this Part, applications by other than licensees or permittees for a Metropolitan Statistical Area (MSA) to serve unserved

1. After some refinements, the CGSA had to include at least 75% of the land or population of the MSA, and an applicant had to demonstrate that it could provide reliable service for at least 75% of its CGSA. 47 C.F.R. § 22.903(a) (1987).

2. The FCC's terminology in this area has been evolving, with some resulting confusion. The FCC initially referred to all such supplementary applications, whether filed by incumbents or by their competitors, as "fill-in" applications. In the order at issue here, the *Second Report and Order*, 2 F.C.C.Rcd. 2306 (1987), *modified in part, Order on Reconsideration of Second Report and Order*, 4 F.C.C.Rcd. 5377 (1989), the Commission appeared to use the term "fill-in" exclusively to refer to nonincumbents' applications, *see id.* at 2310 n. 3 ("fill-ins" were for "new cellular systems"), except that it also referred to the incumbents' expansion period as a "fill-in"

period. Finally, in a 1991 order, the agency further refined its terminology, using "fill-in application" to refer exclusively to expansion applications from incumbent permittees or licensees during their expansion or "fill-in" periods, and "applications to serve unserved areas" to refer to applications filed after the fill-in period, presumably by incumbents and challengers alike. *First Report and Order and Memorandum Opinion and Order on Reconsideration*, 6 F.C.C.Rcd. 6185, 6188 n. 6 (1991). *See also Public Notice*, Report No. CL–93–36 (December 23, 1992), slip op. at 1 (defining unserved areas as "areas in which the initial licensees are not providing service … [a]fter the five-year fill-in period expires"). This decision adopts the Commission's final definitions, except where otherwise specified.

areas outside the presently authorized CGSA but within the MSA are prohibited from being filed and will not be considered as mutually exclusive with a licensee's or permittee's application filed under § 22.903(d) herein until five years from the date of the first construction permit granted in that MSA.

47 C.F.R. § 22.31(a)(1)(i) (1987). The text of the order further provided the following:

> We are establishing a period of five years from the date the first construction permit is granted in each MSA for licensees/permittees to expand their CGSAs within the MSAs. A date certain filing date will thus be established for each MSA market.

*Second Report and Order*, 2 F.C.C.Rcd. at 2307.

> We are providing that licensees/permittees will have five years from the date of the first construction permit granted in each of the 305 MSAs ... to file applications to modify or expand their CGSA within the MSA.... *After five years from such a date, parties desiring to serve unserved areas beyond the CGSA but within the MSA may file fill-in applications for an MSA.*

*Id.* at 2308 (emphasis added).

> Based on our experience in processing initial cellular applications, and later, the fill-in applications, we are reserving our right to set future dates certain for the filing of fill-in applications in RSAs [Rural Service Areas].

*Id.*

> Given our current emphasis on granting authorizations in the 305 MSA markets and in establishing procedures and rules for the filing of applications for RSAs, we conclude that this is not the time to establish the process for *selecting* the fill-in applications. This process will be determined at a later date.

*Id.* at 2309 (emphasis added).

> This *Report and Order* provides that a date certain will be set at five years after the date of the first construction permit granted in each MSA for filing applications that will result in expansion of a licensee's/permittee's CGSA within the

MSA. *We are also providing for the filing of fill-in applications to serve the unserved areas of the MSA as discussed.*

*Id.* (emphasis added).

Two footnotes in the order are also relevant. Footnote 13 is largely a restatement of the text:

> [T]o ensure no further confusion arises, we are modifying Section 22.31 to reflect our interpretation of the rules that competing applications may not be filed when the major modification is an application to expand CGSA filed within five years of the first construction permit for the MSA.

*Id.* at 2311 n. 13. Footnote 17, however, as discussed below, adds a new wrinkle. It states:

> Even though the dates of the first construction permit grants can be gathered from prior public notices, the Commission will issue at a future date a public notice announcing the initial construction permit dates for the MSAs and when the five year expansion period will expire. Thus, clear notice of the expiration date of this period will be provided. We will also announce later when the fill-in applications must be filed for each MSA.

*Id.* at 2311 n. 17.

Finally, the order explained that its modification of § 22.31 reaffirmed and codified the Commission's existing date certain policy, which provided that "applications must be filed by a date certain set by the Commission." *Id.* at 2307.

### B. *Procedural Background*

Petitioners in this case are four companies engaging in cellular communications. They all filed applications to serve unserved areas in given MSAs after the expiration of that MSA's five-year expansion period, but before the Commission had made any additional announcement of a date certain or procedures for filing or selecting these applications. Of these, only L.A. Partnership was an incumbent in the market in which it filed. McElroy filed an application to serve unserved areas in the

Greater Los Angeles MSA on August 1, 1988, more than five years after April 26, 1983, when the incumbent, L.A. Partnership, received its first construction permit. Within sixty days of the public notice of McElroy's filing, L.A. Partnership, JAJ, and three other applicants filed competing mutually exclusive applications. Price filed an application for Los Angeles on January 29, 1989, more than sixty days after McElroy's filing, but argues that its application was nonetheless timely because the public notice concerning McElroy's application failed to give adequate notice that it had been "accepted for filing," as required by 47 C.F.R. § 22.31(b)(2)(i). Additionally, McElroy filed an application for the Minneapolis–St. Paul MSA on January 11, 1989, and for the Phoenix MSA on January 17, 1989. JAJ also filed an application for Phoenix within 60 days of the first public notice of a competing application within that MSA.[3]

Before filing its first application, McElroy consulted staff of the Commission's Mobile Services Division, who advised McElroy that its application could be filed pursuant to the Commission's "fill-in rule," 47 C.F.R. § 22.31(a)(1)(i). The Commission's public notice announced that McElroy had filed an application that "propose[d] to *serve unserved areas in the Los Angeles MSA ... under Section 22.-31(a)(1)(i) of the rules."* Public Notice, Report No. CL–88–15 (August 29, 1988) (emphasis in original). The Commission issued similar public notices for the competing applications, as well as a final notice listing all of the applications. *See Public Notice,* Report No. CL–89–14 (October 27, 1988); *Public Notice,* Report No. CL–89–33 (November 26, 1988); *Public Notice,* Report No. CL–89–40 (December 1, 1988); *Public Notice,* Report No. CL–89–57 (December 12, 1988) (final notice). Similar notices were issued for other MSAs. *See, e.g., Public Notice,* Report No. CL–89–80 (February 6, 1989) (McElroy's applications for Minneapolis–St. Paul and Phoenix).

In each market, the incumbents challenged these applications as premature. On April 10, 1989, the Chief of the FCC's Common Carrier Bureau ordered the dismissal of all of these applications on the grounds that they were filed prior to any FCC notice of when the expansion period had expired or when such applications must be filed, and prior to the establishment of procedures for accepting, processing and selecting among such applications. *Cellular Applications for Unserved Areas in MSAs/NECMAs,* 4 F.C.C.Rcd. 3636, 3637 (Com.Car.Bur.1989) ("*April Order*"). The applications were dismissed without prejudice to refiling once the agency had completed a rulemaking to set the necessary terms. *Id.* The Commission did, however, agree to retain on file the applications of incumbents who were the second licensees in their MSAs,[4] since it was considering a proposal to extend their expansion periods. *Id.*

All four petitioners filed petitions for reconsideration of the *April Order.* The Commission denied these petitions on July 1, 1991 in its *First Report and Order and Memorandum Opinion and Order on Re-*

---

3. The incumbent licensee in Phoenix filed an application to expand its CGSA on December 14, 1988; this application was put on public notice on January 23, 1989. *Public Notice,* Report No. CL–89–66, January 23, 1989 (application of Metro Mobile CTS of Phoenix, Inc.). Similarly, the Minneapolis–St. Paul incumbent filed an expansion application on December 30, 1988, which was put on public notice on January 31, 1989. *Public Notice,* Report No. CL–89–75, January 31, 1989 (application of Minnesota Cellular Telephone Company). In both cases, the incumbent filed its expansion application more than five years after the grant of the first construction permit in that MSA, and McElroy filed its unserved area application before the incumbent's application was put on public notice.

4. The FCC divides the radio spectrum for cellular telephone service into two "frequency blocks," wireline and nonwireline, and licenses two cellular carriers in each market. As a rule, the wireline licensees receive the first construction permit, which starts the five-year clock. When the Commission issued its *April Order,* it had before it petitions from nonwireline licensees, who frequently receive their licenses a year or two later, and who complained that this did not leave them sufficient time to expand without competition. *See Order on Reconsideration of Second Report and Order,* 4 F.C.C.Rcd. 5377 (1989).

*consideration,* 6 F.C.C.Rcd. 6185 (1991) (*"First Report and Order "*). In the same order, the agency also rejected JAJ's and McElroy's petitions for reconsideration of its *Order on Reconsideration of Second Report and Order,* 4 F.C.C.Rcd. 5377 (1989), which modified the five-year exclusive fill-in period to run from the date of each licensee's first construction permit, instead of from the date of the first permit in the MSA. Rejecting McElroy's and JAJ's assertion that this modified expansion period had been applied retroactively to dismiss their applications, the Commission insisted that the applications were dismissed solely because they were premature under the *Second Report and Order,* without regard to any change in the calculation of the expansion period. *First Report and Order,* 6 F.C.C.Rcd. at 6193. Finally, the Commission adopted rules and procedures for the filing and processing of applications for unserved areas, and decided to use a lottery to select the licensee from among the applicants. *Id.* at 6217–19.

More recently, the Commission issued a *Second Report and Order* in another docket, CC Docket No. 90–6, 7 F.C.C.Rcd. 2449 (1992), in which it redefined—and expanded—the contours of a CGSA and applied this new definition to existing cellular systems. JAJ and McElroy sought reconsideration of this order, challenging the enlargement of CGSAs into areas for which unserved area applications had been submitted. The Commission has denied those petitions for reconsideration. *Memorandum Order and Order on Reconsideration,* CC Docket No. 90–6 (released February 19, 1993).

Finally, the Commission has issued a Public Notice announcing a two-phase application procedure [5] for specified unserved

areas. *Public Notice,* Report No. CL–93–36 (December 23, 1992), slip opinion ("slip op.") at 1. The public notice defined unserved areas as "areas in which the initial licensees are not providing service ... [a]fter the five-year fill-in period expires...." It announced one-day "filing windows" for Los Angeles, Minneapolis–St. Paul, and Phoenix beginning (and ending) March 10, 1993.

Briefly, then, to recap the sequence of events: In April 1987, in its *Second Report and Order,* the Commission announced that incumbents' protected expansion periods would last five years from the date of the MSA's first construction permit. In 1988 and 1989, as those expansion periods expired, petitioners filed applications in selected MSAs for areas that remained unserved. In April 1989, the Commission in its *April Order* dismissed those applications as premature. Two months later, in June 1989, the Commission issued its *Order on Reconsideration of Second Report and Order,* in which it extended the expansion period for the second licensee. Over two years later, in October 1991, the Commission issued its *First Report and Order,* [6] in which it announced a change in the calculation of the expansion period which effectively expanded the second incumbents' window of protection; announced the procedures (but not the dates) for filing unserved area applications; and determined that it would select from these applications through a lottery procedure. In April 1992, the Commission redefined the contours of a CGSA in a manner that increased incumbents' territories. Finally, in December 1992, five years after the original pronouncements on the five-year period and as much as three or four years after some of the expansion periods expired, the

---

5. Phase I is a one-day filing window for applications to be selected by lottery. Phase II is an open-ended period during which applications are to be accepted on a first come, first served basis. It begins either one day after Phase I, if no Phase I applications are received, or on the 121st day after the Phase I license authorization is granted.

6. Because the two orders were issued in different dockets, the *Second Report and Order* did, indeed, precede the *First Report and Order* by

five years. The *Second Report and Order* was issued in CC Docket No. 85–388, a rulemaking proceeding directed primarily at amending the Commission's rules for rural cellular service. The *First Report and Order,* although it did deny the petitions for reconsideration of the *Second Report and Order,* dealt primarily with proposed changes to the Commission's rules for filing and processing applications for unserved areas, which were addressed in CC Docket No. 90–6.

Commission announced "dates certain" for filing unserved area applications; the first of these dates was March 10, 1993.

Before proceeding to the legal analysis, it is worth noting what is at stake here. The Commission dismissed petitioners' applications without prejudice to their refiling. An observer uninitiated in the cellular licensing process might respond, "Big deal. They can just refile." It is not that easy. Neither time nor the FCC nor petitioners' competitors have stood still in the roughly four years since petitioners filed the disputed applications. In the interim, the rules of the game have changed, generally not to petitioners' benefit. As lotteries have replaced comparative hearings, more applicants have entered the field in competition with petitioners. Moreover, in the intervening years, the FCC has expanded the time and the territory available to incumbents free from competition, raising petitioners' fears that the markets that were available when they filed will have been gobbled up by the time they are permitted to refile. At this juncture, we determine only the threshold question of reinstating the petitions, not the proper means of processing those applications.

## II. ANALYSIS

### A. *Prematurity of Applications*

■ Since the Commission dismissed petitioners' applications as premature, the principal issue before us is what notice the Commission's *Second Report and Order* provided with regard to the filing date for applications to serve unserved areas. The standard of review is important here. We do not require that the agency have made the clearest possible articulation, only that, based on a "fair reading" of its order, the petitioners knew or should have known what the Commission expected of them. *RCA Global Communications, Inc. v. FCC*, 758 F.2d 722, 730–31 (D.C.Cir.1985). In this case, we ask whether a fair reading of the order would put the reader on notice that the Commission had not in fact established dates certain for filing applications to serve unserved areas, but was simply indicating its intent to do so in the future. As we recently stated in a similar case:

> It is beyond dispute that an applicant should not be placed in a position of going forward with an application without knowledge of requirements established by the Commission, and elementary fairness requires clarity of standards sufficient to apprise an applicant of what is expected. As Judge Leventhal stated in *Radio Athens, Inc. (WATH) v. FCC*, 401 F.2d 398, 404 (1968) (dismissal of applications without hearing for patent non-conformance with Commission rules): "The Commission is entitled to expect good faith on the part of the broadcasting industry in supplying data requested. The industry is correspondingly entitled to expect rules defining the required content of applications that are *reasonably comprehensible to [people] of good faith.*"

*Maxcell Telecom Plus, Inc. v. FCC*, 815 F.2d 1551, 1558 (D.C.Cir.1987) (quoting *Bamford v. FCC*, 535 F.2d 78, 82 (D.C.Cir.), *cert. denied*, 429 U.S. 895, 97 S.Ct. 255, 50 L.Ed.2d 178 (1976)) (emphasis added by *Maxcell* court) (footnote omitted). Thus, we look not at the reasonableness of the Commission's intended interpretation, but at the clarity with which the agency made that intent known. That is, we ask whether the interpretation of the order that the Commission now puts forward was—at the time the order was issued—"reasonably comprehensible to [people] of good faith." Where the agency's order suffers from a "lack of clarity," such that its "effect ... upon the [petitioners is] unclear," *Kansas Cities v. FERC*, 723 F.2d 82, 86 (1983), we will ask what the petitioners "justifiably understood" and whether anything in the order "made it apparent that the Commission meant otherwise." *See id.*

■ We emphasize that we are not deciding that the Commission could not reasonably and within its discretion issue an order fixing a deadline for the incumbents' protected filing period and, at the same time announce that it would, in the future, set dates certain on which incumbents and nonincumbents alike would be permitted to file applications to serve unserved areas.

We recognize the Commission's broad discretion to make, interpret and apply its own policies. *See Marlin Broadcasting v. FCC*, 952 F.2d 507, 511 (D.C.Cir.1992) (quoting *New South Broadcasting Corp. v. FCC*, 879 F.2d 867, 870 (D.C.Cir.1989)). The issue before us is not what the Commission reasonably can do, but what its *Second Report and Order* can reasonably be construed to have done.

In this light we examine the parties' arguments. About the only thing the parties agree on is that the order carved out a five-year fill-in period during which incumbent licensees and permittees could expand without competition. In any event, this point is not in contention here, as no party attempted to breach the protection afforded by this grace period. The FCC goes beyond this, however; in its brief to this court it asserts that the *Second Report and Order* provided that, "[a]fter the protected period ended *and* after the Commission established a procedure for processing such applications and a date for filing applications, [nonincumbents] should have an opportunity to apply for unserved areas." The Commission insists that the order itself did not set any dates certain for filing applications; instead, it merely foretold the Commission's intention to set these dates. Thus, according to the agency, because the order did not establish, and the Commission had not announced, a date certain and procedures for filing applications for unserved areas, the petitioners' applications were premature.[7] Petitioners, of course, paint an entirely different picture of the *Second Report and Order*. They read the statement that the date certain for filing applications to serve unserved areas "will be set" at five years from the grant of the first construction permit in the MSA to establish a date certain for those applications. That is, the date certain for filing coincides with the termination of the expansion period. Then, they read the statement

that parties desiring to serve these areas "may file" after five years from the grant of the first permit to authorize them to file their applications after that date.

### 1. The "Fill-in Rule"

Our own analysis starts with the "fill-in" rule itself, asking what notice it provides if we give effect to the natural and plain meaning of its words. This rule, as revised by the *Second Report and Order*, provides that nonincumbents' applications "are prohibited from being filed and will not be considered as mutually exclusive with a licensee's or permittee's application filed under § 22.903(d) herein until five years from the date of the first construction permit granted in that MSA." 47 C.F.R. § 22.-31(a)(1)(i) (1987). Read by itself, that statement certainly raises a reasonable inference not only that nonincumbents were prohibited from filing "until" five years from the permit date but that, after the five years was up, they would be permitted to file. That is, once the five-year filing moratorium expired, there remained no further bar to nonincumbents' filing. The plain language does not say that nonincumbents may not file "until some time after" the expansion period ends or "until five years from the permit date and until other conditions are met." If the Commission intended by this sentence to put nonincumbents on notice that they would be permitted to file only at some indefinite point in the future, after the termination of the expansion period and after the Commission had announced the dates certain and procedures for filing, the rule, standing alone, falls short.

The Commission does not rely solely on the language of the fill-in rule, however. While maintaining that the rule, by its own terms, provides only for a finite period during which the nonincumbents' applications will *not* be accepted, not for any

---

**7.** The Commission wisely does not dispute that the order established the date certain for ending the expansion period. *See, e.g., Second Report and Order*, 2. F.C.C.Rcd. at 2308 (plan set up "an orderly and predictable process on the basis of a date certain for each MSA for accepting applications from licensees/permittees"); *id.* at 2307 ("We are establishing a period of five years from the date the first construction permit is granted in each MSA for licensees/permittees to expand their CGSAs within the MSAs. A date certain filing date will thus be established for each MSA market.").

dates when they *will*, the Commission stops short of arguing that its language alone put petitioners on notice that they could not file until after the Commission announced procedures for and gave public notice of dates certain for filing. For that it looks to other parts of the *Second Report and Order*, the next stopping point in our analysis.

### 2. The Text of the Order

Reading through the text of the *Second Report and Order*, we find numerous statements from which an attentive reader could and likely would infer that, once the expansion periods had ended, those who wanted to serve unserved areas would be free to file applications for them. The Commission started its discussion by reaffirming its policy that incumbents' unchallenged "cellular applications must be filed *by* a date certain set by the Commission...." *Second Report and Order*, 2 F.C.C.Rcd. at 2307 (emphasis added). It announced that it was setting a five-year expansion period for incumbents and that "[a] date certain filing date will thus be established for each MSA market." *Id.* Then, after recounting comments it had received, *id.* at 2307–08, and stating that it was "providing that licensees/permittees will have five years from the date" of the first construction permit to file unchallenged applications, the Commission made this critical statement: "After five years from such a date, parties desiring to serve unserved areas beyond the CGSA but within the MSA *may file* fill-in applications for an MSA." *Id.* at 2308 (emphasis added).

We find absolutely nothing in the text of the order to alert petitioners to the possibility that this plain statement that those desiring to serve unserved areas "may file" after the five-year expansion period expired did not authorize them to file their applications after that date. To the contrary, petitioners had every reason to read the announcement of the five-year safe harbor for incumbents as an authorization to file thereafter, based both on the text of the order and on the Commission's prior announcement that "after the initial applica-

tion phase [which became the five-year expansion period], we will reopen any unapplied for areas to any applicant under regular notice and cut-off rules...." *Cellular Lottery Rulemaking*, 98 F.C.C.2d 175, 204 n. 81 (1984). The Commission's then-existing "regular notice and cut-off rules" provided that the deadline for accepting mutually exclusive fill-in applications, as they were known at the time, was sixty days "after the date of the public notice listing the first of the conflicting applications as accepted for filing" (or thirty days after the public notice and one day before the Commission acts on the first application, whichever is earlier). 47 C.F.R. § 22.-31(b)(2)(i) and (ii).

When the Commission adopted § 22.-31(a)(1)(i), providing for the exclusive expansion period, as part of the *Second Report and Order*, it left intact the remainder of § 22.31, including the notice and cut-off procedures. Thus, the most logical way to read the change is as a discrete exception to or modification of the existing and continuing fill-in procedures. This would mean that, once the five-year moratorium elapsed, the established notice and cut-off procedures would operate. Since the order provided that persons wishing to serve unserved areas "may file" after the expansion period ended, without clearly mandating or foretelling any specific procedures for filing, the natural conclusion, which is the one petitioners reached, is that they were to file under the Commission's established procedures.

We cannot conclude that the clear impression conveyed by the order that applicants could file at the end of the five-year periods is undermined by either of the two provisions of the text that the Commission invokes to counteract that reading. The Commission points first to the statement that "this is not the time to establish the process for selecting the fill-in applications." *Second Report and Order*, 2 F.C.C.Rcd. at 2309. Quite clearly, this statement refers only to *selecting* among the applications, not accepting them for

filing.[8] Since the Commission frequently accepts and retains applications while deciding on the means for selecting licensees, *see, e.g., Cellular Lottery Rulemaking,* 98 F.C.C.2d 175 (1984); *Amendment of the Commission's Rules to Allow Random Selection or Lotteries,* 93 F.C.C.2d 952 (1983); *Amendment of Part 90 of the Commission's Rules,* 7 F.C.C.Rcd. 4484 (1992), this reservation by itself could not have alerted petitioners that their filings would be premature.

Second, the Commission argues that the future tense statement that dates certain "will be set" at five years signals that they are not actually being set in the order. In the same order, however, the Commission clearly and unambiguously declared that other dates certain would be set in the future: "[W]e are *reserving our right to set future dates certain* for the filing of fill-in applications in RSAs [Rural Service Areas]," *Second Report and Order,* 2 F.C.C.Rcd. at 2308 (emphasis added). Thus, the Commission obviously knew how to convey with clarity that it was postponing a decision or an announcement until some unspecified future date. By contrast, we are unable to conclude that its statement that "a date certain *will be set* at five years after the date of the first construction permit granted in each MSA filing dates," *id.,* could reasonably tip off a reader that this date certain, which the Commission has already *fixed* at five years from the first permit date, will nonetheless not be "set" until the Commission compiles and publishes a comprehensive list of dates certain for all MSAs.

3. The Footnote

Having traversed the text of this order, our journey is not yet o'er, for we arrive at the real battleground of this dispute: the footnotes, or more precisely, the last footnote, and particularly the last sentence of this last footnote. It reads: "We will also announce later when the fill-in applications must be filed for each MSA." *Second Report and Order,* 2 F.C.C.Rcd. at 2311 n. 17. In the Biblical mode of "saving the best wine for last," the Commission maintains that this terminal sentence provides the real notice that the Commission will announce dates certain for filing unserved area applications at a later time and that no applications will be accepted until after that later announcement. We cannot agree that this is an obvious or even a reasonably apparent reading of that obscurely placed nugget. Even read in isolation, the sentence is ambiguous. When read in the context of the footnote, and especially in the context of the entire order, we find it far too slim a reed to bear the weight the Commission hoists upon it.

We focus, then, on the pivotal sentence addressing "when the ... applications must be filed." [9] The Commission asserts that this refers to a date certain on which all unserved area applications—or at least the first of these applications—must be filed in each MSA. Petitioners, however, offer what we think is a more natural reading of this term. They claim that, to be consistent with the order as a whole, this statement is best read to refer to the end of the 60-day cut-off period following the first application in each MSA. In other words, it means that the Commission will announce "*by* when" competing applica-

**8.** Nonetheless, the Commission has subsequently claimed that its *Second Report and Order* said that the "process *for filing applications* and selecting licensees" would be determined later. *First Report and Order,* 6 F.C.C.Rcd. at 6189 (emphasis added). Even assuming that this was an honest mistake, not a deliberate mischaracterization of the record, we find the Commission's inaccuracy disturbing.

**9.** The Commission has acknowledged that the use in this sentence of the term "fill-in" was confusing, *April Order,* 4 F.C.C.Rcd. at 3637 n. 4, as that term has most often referred to an *incumbent*'s expansion application. The Com-

mission insists, however, that the sentence's "obvious intent was to refer to applications for unserved areas within an MSA at the expiration of the five year fill-in period." *Id.* No petitioner disputes the agency's interpretation of which applications were referenced, and we are inclined to agree that the Commission's professed intent as to *this term* is sufficiently apparent from the context. We are, nonetheless, troubled by the imprecision and the admitted "confusion" in the very sentence which the Commission now claims should have made its entire purpose clear.

tions must be filed. They find the use of the word "must" significant, as the first applicant *may* file once the expansion period has ended, while later applicants *must* file within sixty days of the first public notice of a mutually exclusive application. This is consistent with the common understanding of the word "may" to connote permission or entitlement, and "must" to refer to a requirement.[10]

The footnote as a whole reinforces this interpretation. First, it provides that the Commission will publish a comprehensive list of the dates certain *"[e]ven though* the dates of the first construction permit grants can be gathered from prior public notices...." Second Report and Order, 2 F.C.C.Rcd. at 2311 n. 17 (emphasis added). This suggests that two dates—the date of the first construction permit and the end of the five-year expansion period—were fixed and knowable from the public record. On the heels of the statement that it would announce two already-fixed dates, the Commission volunteered that it would "also announce later when the fill-in applications must be filed for each MSA." *Id.* Even a careful reader would likely conclude that the Commission had undertaken to announce a third date—the expiration of the cut-off period—that also could be calculated from the public record. The much-heralded footnote thus does not, in the final analysis, serve as the beacon the Commission would have us think, illuminating the petitioners' treacherous path through the text and guiding them safely to the conclusion that the Commission now urges.

### 4. The Commission's Subsequent Conduct

Since our inquiry focuses on the notice provided by the *Second Report and Order,* the contents of the order itself are the most important consideration. Looking beyond the four corners of the order, however, we find that the Commission's subsequent conduct only reinforces petitioners' argument that the Commission provided them with no notice of the interpretation on which it based its dismissal of their applications. The Commission's initial acceptance of these applications for filing, while not dispositive, *see* 47 C.F.R. §§ 22.26(a) and (b),[11] is nonetheless relevant, as the Commission staff's "misinterpretation" of the order undermines the Commission's claim that it gave clear notice of its intended meaning. Moreover, the Commission retained some of petitioners' applications for as long as nine months and entertained a complete petition to deny cycle with respect to all of the unserved area applications before concluding that the applications were untimely. In addition, the Commission has repeated, again with no mention of any public notice requirement, its statement that "[a]fter five years, non-licensees *may file* applications for the unserved portions of the MSA." *See Fourth Notice of Proposed Rulemaking,* 3 F.C.C.Rcd. 4050 (1988) (emphasis added); *Fifth Report and Order,* CC Docket No. 85–388, FCC 99–320 (November 1, 1988); *see also Public Notice,* Report No. CL–88–148 (August 18, 1988) (rescinding the grant of a fill-in application filed by a nonlicensee before the expiration of the five-year period, stating that it could not be filed "until after" the five-year mark, but not mentioning any other condition precedent). Finally, the Commission has made a number of subsequent statements that seem to reaffirm an intent to accept nonincumbents' applications at the end of the expansion period. *See, e.g., Amendment of Section 22.902(b),* 3 F.C.C.Rcd. 6614, 6616 n. 5 (1988): ("It

---

**10.** *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1396 (1981) (defining "may" as to "have permission to" or to "have liberty to"); *id.* at 1492 (defining "must" as "obliged to" or "required by law").

**11.** Section 22.26(a) provides: "The assignment of a file number to an application ... does not indicate the acceptance for filing and processing." Section 22.26(b) provides: "Acceptance of an application for filing merely means that it

has been the subject of a preliminary review as to completeness. Such acceptance will not preclude the subsequent return or dismissal of the application if it is found to be defective or not in accordance with the Commission's rules." *See also April Order,* 4 F.C.C.Rcd. at 3637 n. 5 ("placing an application on public notice is not an indication that the application ultimately will be found acceptable for filing").

bears noting that unserved portions of MSAs where the five year 'fill-in' period has elapsed are available and a few non-wirelines have already applied for these authorizations."); *Amendment of the Commission's Rules for Rural Cellular Service (Fifth Report and Order)*, 3 F.C.C.Rcd. 6401 (1988) (exclusivity period longer than five years would deprive some areas of service while five-year limit will insure prompt service to the public).

### 5. Lack of Adequate Notice

█ In sum, having surveyed the relevant provisions of both the text and the footnotes, as well as subsequent acts and statements by the Commission, we conclude that even an alert reader of the Commission's *Second Report and Order* would likely have understood it to mean that unserved area applications would be received upon the termination of the five-year expansion period. Under this reading of the order, by establishing the date certain for ending the expansion period and lifting the moratorium on filing, the Commission in fact established a date certain for filing. By operation of law and by the Commission's established notice and cut-off procedures, the date certain for filing an unserved area application in an MSA is the first day after the expiration of the protected fill-in period.[12] Since the order did not prescribe specific procedures, such as filing windows, for these applications, petitioners appropriately filed pursuant to the Commission's regular notice and cut-off rules, under which there is no single date for the filing of the first mutually exclusive application. Under this regime, the "date certain" for filing is, therefore, merely an opening date, the date *from which* applications *may* be received, not a particular date *on which* they *must* be received. *Cf. Cellular Lottery Rulemaking*, 98 F.C.C.2d at 204 (after initial filing periods had lapsed, Commission would "establish an *opening date*" for the filing of unserved area applications, which would be processed under regular notice and cut-off procedures) (emphasis added).

Our decision today that the Commission's *Second Report and Order* provided inadequate notice of any intent to postpone acceptance of applications to serve unserved areas until after publication of a future notice falls in line with our prior opinion in *Maxcell Telecom Plus, Inc. v. FCC*, 815 F.2d 1551 (D.C.Cir.1987). *Maxcell* involved Commission orders announcing special filing rules during the initial filing period for the ninety largest MSAs. Departing from the Commission's general notice and cut-off procedures, the orders established single filing dates for "all applications" for each affected market. Petitioners challenged the orders on several grounds, including that they provided inadequate notice of their applicability to unserved area applications, or "fill-in" applications, as they were known at the time. *See supra* note 2. We stated that the Commission's "public pronouncements on the deadline for fill-in applications ha[d] been needlessly unclear," *id.*, but concluded that they sufficed, "though just barely," *id.* at 1559, to provide notice that they applied to fill-in applications, as well as applications for the core of an MSA. We reached a different result, however, for the one petitioner, La Star Communications, that had filed its fill-in application in response to an incumbent's proposed expansion. *Id.* at 1560. Because the Commission, at that point, routinely permitted such opposition to an incumbent's proposed expansion, and because nothing in either relevant order informed La Star that it superseded those procedures, we held that the order did not give sufficient notice that *competing* fill-in applications would not be accepted after the date certain or cut-off date. *Id.* Turning to the present case, we believe that the

---

**12.** Thus, under this interpretation of the order, we need not resolve the order's ambiguity as to whether its references to "date certain" referred to the date certain by which an incumbent must file unchallenged expansion applications, or the date certain from which nonincumbents could file unserved area applications. *See Second Re-* *port and Order,* 2 F.C.C.Rcd. at 2307, 2308. Moreover, the Commission's failure timely to fulfill its promise to calculate, compile and publish each individual date certain does not change this result, as the publication of the clear rule or formula was sufficient to announce the dates certain.

*Second Report and Order* similarly failed to give sufficient notice that unserved area applications would not be accepted under the Commission's general notice and cut-off procedures upon the termination of the expansion period.

We therefore reverse the Commission's dismissal of applications for unserved areas filed after the expiration of the expansion period and before the end of the then-existing sixty-day cut-off period on the ground that they were untimely, and we remand with instructions to reinstate those applications *nunc pro tunc.* There is no dispute that McElroy, L.A. Partnership, and JAJ filed their applications within this filing window. Petitioner Price's application, however, raises a question as to its timeliness. Price, which filed its application for Los Angeles more than sixty days after McElroy filed its mutually exclusive application, urges that its application should not be barred because the sixty-day cut-off period applies only from the date of public notice that the first application is "accepted for filing," and the FCC's public notice concerning McElroy's application did not give sufficient notice that it had achieved this status.[13] We leave it to the Commission to determine on remand the timeliness of Price's application within the context of our discussion as to the comprehensible meaning of the *Second Report and Order.*

## B. *Other Challenges*

■ Petitioners mount a variety of other challenges, most of which can be categorized as claims that the Commission's failure to give full and explicit notice of its

new fill-in policy violated petitioners' rights under *Ashbacker Radio Corp. v. FCC,* 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), which defines when competing applicants for a federal license are entitled to a comparative hearing. Under this rubric, they complain of improper notice that their unserved area applications filed after the five-year expiration date could still be dismissed as untimely; of the new definition of the contours of a CGSA, which, they claim, automatically enlarged the incumbents' territory beyond the five-year expansion period without competing applications; of insulating the incumbents for as long as five years beyond the expansion period pending the rulemaking; and of the enlarged expansion period for the second licensee in an MSA. Additionally, they allege that affirming the dismissal of the applications was an arbitrary and capricious reversal of the FCC's established policy concerning the filing of unserved area applications; that it was improper to extend the expansion period for second licensees in an *Order for Reconsideration;* that the Commission improperly gave retroactive effect to this rule; and that the use of a lottery to select the licensees was arbitrary and capricious. Finally, the nonincumbent petitioners complain of the Commission's failure to treat them the same as the incumbents, while petitioner L.A. Partnership, an incumbent, complains of the Commission's failure to treat it the same as other incumbents.

These claims are not properly before the court, as they formed no part of the Commission decision under review. *SEC v. Chenery,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). Since the Com-

---

**13.** Unlike some other public notices issued by the Commission, which were captioned "CELLULAR RADIO APPLICATIONS ACCEPTED FOR FILING," and which expressly stated that the listed applications had been found upon initial review to be acceptable for filing, the public notice that included McElroy's application for Los Angeles was captioned "COMMON CARRIER PUBLIC CELLULAR RADIO SERVICE INFORMATION," and the applications themselves were listed under a heading "Informative." Price accordingly argues that these notices came under § 22.27(a)(3), which applies to public notices listing "[i]nformation which the Commission in its discretion believes of

public significance." Such notices "are solely for the purpose of informing the public and do not create any rights in an applicant or any other person." *Id.* Although the Commission's dismissal of Price's application as premature foreclosed any determination of whether it was late, the Commission has argued, in defending its dismissal of this and other applications that it was "pertinent ... that the staff notices issued immediately after the applications for Los Angeles were tendered did not characterize the staff action as accepting those applications for filing." On remand, the Commission will have the opportunity to consider the pertinence of that fact in this context.

mission dismissed petitioners' applications solely on the ground that they were premature, *see April Order,* 4 F.C.C.Rcd. at 3636, it did not determine whether or to what extent any subsequent orders or developments, such as the use of lottery procedures and the change in the calculation of the five-year expansion period, would affect petitioners' rights. When it carries out our instructions to reinstate petitioners' timely filed applications, the Commission still must determine which, if any, of its subsequent orders should be applied retroactively to petitioners' reinstated applications. Without in any way determining these issues, we highlight three points that will merit the Commission's attention on remand.

The first, as just mentioned, is retroactivity. When the Commission reinstates petitioners' applications, it is faced with the dilemma of whether to consider those applications under its current rules and conditions, which would, in some cases, disadvantage petitioners, or whether to attempt to restore the status quo, which could disturb the rights and expectations of those who benefited from the Commission's subsequent actions.[14] In dismissing petitioners' applications for prematurity, the Commission declined to "address at length" petitioners' arguments relating to its subsequent orders and actions. The Commission did, however, venture its opinion that the extension of the five-year expansion period for the second licensee would only "collaterally affect[ ] petitioners' expectations," and was therefore not retroactive. *First Report and Order,* 6 F.C.C.Rcd. at 6193. More recently, however, the Commission has acknowledged that, should we order reinstatement, it could grant petitioners appropriate relief. Referring to McElroy's and JAJ's challenge to the enlargement of

the incumbents' CGSAs in markets for which nonincumbents had submitted unserved area applications, the Commission noted that these incumbents' applications would be "subject to rescission" if petitioners' applications were reinstated. *Memorandum Order and Order on Reconsideration,* CC Docket No. 90–6 (released February 19, 1993), slip op. at 6.

We trust that, if and when squarely confronted with the retroactivity question, the Commission will provide a reasoned justification for its decision that reflects its balancing of all the relevant interests involved in retroactivity decisions. *See Yakima Valley Cablevision v. FCC,* 794 F.2d 737, 745–46 (D.C.Cir.1986) (discussing balancing criteria for determining propriety of retroactive application of rules); *id.* at 746 ("Only if an agency explains its rationale for retroactively changing its prior practice can a reviewing court determine whether that decision is a product of rational analysis."); *Maxcell,* 815 F.2d at 1554 ("As the Supreme Court has explained, retroactive enforcement of a rule is improper only if the 'ill effect of the retroactive application' of the rule outweighs the 'mischief' of frustrating the interests the rule promotes.") (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947)); *see also Local 900, International Union of Elec., Radio & Mach. Workers v. NLRB,* 727 F.2d 1184, 1194–95 (D.C.Cir. 1984); *Retail, Wholesale & Dep't Store Union v. NLRB,* 466 F.2d 380, 390 (D.C.Cir.1972).

Second, we remind the Commission of the importance of treating similarly situated parties alike or providing an adequate justification for disparate treatment. L.A. Partnership complained, for example, that

---

**14.** Take, for example, a petitioner's timely application to serve Area A, which at the end of the expansion period was left unserved. After dismissing the petitioner's application—without prejudice to refiling—the Commission changes its rules, either to give the incumbent more time to apply or to expand the contours of its CGSA. The incumbent files an application to serve Area A, the Commission grants it, and the incumbent may even make investments necessary to provide the promised service. But later we hold

that the Commission erred in dismissing the petitioner's application and instruct the agency to reinstate it *nunc pro tunc.* In processing petitioner's application, the Commission may be faced with the choice between retroactively applying its subsequent rules and orders, under which the incumbent is entitled to the area, or returning to the status quo at the time of filing, giving petitioner a fair shot at the area that was available when it applied.

the Commission had dismissed its application filed after the expiration of the expansion period while retaining on file—and even granting—applications from other incumbents filed under the same circumstances. The Commission countered that the other applications were distinguishable in that they involved only *"de minimis ...* contour extensions *outside the MSA,"* which are "not considered CGSA extensions and thus are not applications for unserved areas." *First Report and Order,* 6 F.C.C.Rcd. at 6192 (emphasis added). L.A. Partnership points out, however, that in Phoenix, the Commission retained and granted the application of incumbent US WEST NewVector, Inc., whose application specifically stated that it sought to "expand the previously permitted CGSA, *within the MSA."* It therefore appears that the distinction offered by the Commission may not adequately explain its differing treatment of incumbents.[15]

Finally, although it should be unnecessary at this point, we urge the Commission—again—to strive for clarity in its future orders. As Professor Rodell admonished some fifty years ago, "[d]ealing in words is a dangerous business," FRED RODELL, WOE UNTO YOU, LAWYERS! 39 (Berkeley ed. 1980), and those dangers are multiplied where, as here, an agency's words have far-reaching economic, social or personal consequences. The Commission drafted the *Second Report and Order* in 1987, when certain of its previous orders were under review by this court in *Maxcell.* (In fact, the Commission adopted the order on the day we issued our *Maxcell* opinion.) Mindful of the confusion generated by the *Maxcell* orders, the Commission purportedly sought in this order "to ensure no further confusion arises." *Second Report and Order,* 2 F.C.C.Rcd. at 2311 n. 13. Nonetheless, the Commission issued an order in which its intent is so obscure as to elude a conscientious reader. We caution

the Commission not to use language that it must later concede is "confusing," and not to bury what it believes to be the heart of its order in the last line of a footnote. *Cf. RCA Global Communications, Inc. v. FCC,* 758 F.2d 722, 730 (D.C.Cir.1985) (rejecting the "Commission's entirely private view that two utterly opaque footnotes in a lengthy opinion" were sufficient to put petitioner on notice of the Commission's intent). When the "meat" of an order is thus diverted, "[t]he footnote [has] ... acquired its full capacity for mischief." Abner J. Mikva, *Goodbye to Footnotes,* 56 U.COLO. L.REV. 647, 648 (1985). Such obscurity and imprecision collide with the Commission's responsibility, shared by all federal agencies, of issuing intelligible orders. This responsibility was recently highlighted by a presidential directive instructing each agency to take steps to "eliminate drafting errors and needless ambiguity" and to "make every reasonable effort to ensure ... that the regulation ... [p]rovides a clear and certain legal standard for affected conduct...." Executive Order No. 12,778, Civil Justice Reform, 56 Fed.Reg. 55,195, 55,196 (Oct. 23, 1991). We reiterate today our conviction that "[t]he Commission is able to state its position clearly...." *Maxcell,* 815 F.2d at 1558 (citation omitted). We look forward to proof that we are right.

### III. CONCLUSION

We do not read the Commission's *Second Report and Order* to put petitioners on notice that they could not apply for unserved areas until the Commission had made an additional announcement of the relevant dates, as "it is well settled that regulations cannot be construed to mean what an agency intended but did not adequately express." *L.R. Willson & Sons, Inc. v. Donovan,* 685 F.2d 664, 675 (D.C.Cir.1982) (citing *Kent Nowlin Constr. Co. v. Occupational Safety & Health Re-*

---

**15.** Additionally, petitioners note that the Commission retained and later granted a mutually exclusive application filed by Metro Mobile CTS of Phoenix, the nonwireline incumbent in Phoenix, *see Public Notice,* Report No. CL–92–5 (October 9, 1991), although the record does not reflect whether the application was filed within

the enlarged expansion period. The grant of these licenses raises questions about the accuracy of the Commission's assertion that "[n]o mutually exclusive applications for areas and frequencies for which [petitioners] are eligible to apply ... have been granted." *First Report and Order,* 6 F.C.C.Rcd. at 6191.

*view Comm'n,* 593 F.2d 368, 371 (10th Cir. 1979)). Nor can we, consequently, draw the line in this case at lamenting the Commission's lack of clarity as "unfortunate," evidencing "a regrettable and needless deficiency in drafting," then ultimately give it a pass. *See Maxcell,* 815 F.2d at 1560. This one fails to make the grade.[16] Accordingly, we reverse the Commission's order dismissing petitioners' applications as premature and remand with instructions to reinstate L.A. Partnership's, McElroy's and JAJ's applications *nunc pro tunc,* and to do the same with Price's if it determines that it was timely filed.

*So ordered.*

---

**16.** *See* Thomas O. McGarity, *Some Thoughts on "Deossifying" the Rulemaking Process,* 1992 DUKE L.J. 1385, 1453.